GEODYNE ENERGY INCOME PRO-DUCTION PARTNERSHIP I–E, Geodyne Energy Income Production Partnership I–F, Geodyne Production Partnership II–A, and Geodyne Resources, Inc., Appellants,

v.

The NEWTON CORP., Appellee.

No. 05–02–00070–CV.

Court of Appeals of Texas,
Dallas.

Jan. 23, 2003.

Karin B. Torgerson, Locke Liddell & Sapp LLP, C. Michael Moore, Locke Purnell Rain & Harrell, P.C., Dallas, for appellants.

Jeffrey C. King, Hughes & Luce, Dallas, John M. Zukowski, Zukowski & Breshenhan, Houston, for appellee.

Before Chief Justice THOMAS and Justices FARRIS [1] and ROSENBERG.[2]

1. The Honorable David F. Farris, Retired Justice, Second District Court of Appeals, Fort Worth, Texas, sitting by assignment.

2. The Honorable Barbara Rosenberg, Former Justice, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

## OPINION

Opinion by Justice FARRIS (Retired).

This case involves liability for the costs of plugging an off-shore oil and gas well. In four points of error, Geodyne Energy Income Production Partnership I–E, Geodyne Energy Income Production Partnership I–F, Geodyne Production Partnership II–A, and Geodyne Resources, Inc. (collectively, Geodyne) appeal the trial court's judgment in favor of The Newton Corp. (Newton), contending (1) the trial court erred in granting judgment on Newton's claim under the Texas Securities Act, TEX. REV.CIV. STAT. ANN. arts. 581–1 to 581–43 (Vernon Supp.2003) (the TSA), because Newton still owns the security and because there is legally and factually insufficient evidence of (a) reliance, (b) causation, or (c) a misrepresentation or omission of material fact by Geodyne; (2) there is legally and factually insufficient evidence to support the jury's finding that Geodyne owned a non-operating working interest in the well at the time it was required to be plugged or to support the award of attorney's fees to Newton; and (3) the trial court erred in denying Geodyne's indemnity claim against Newton.

Because Newton's sole remedy under the TSA is to rescind the transaction, we modify the trial court's judgment to rescind the sale of the oil and gas lease. We affirm the trial court's judgment, as modified, on all grounds (other than the award of attorney's fees to Newton) because (1) Newton was required to prove neither causation nor reliance to recover under the TSA and (2) the jury's findings that Geodyne omitted a material fact in the sale of a security and Geodyne owned a non-operating working interest in the well at the time it was required to be plugged are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We reverse and remand the issue of attorney's fees to the trial court for further consideration because Newton failed to carry its burden of establishing the fees could not be segregated.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1978, the State of Texas granted an oil and gas lease in the Gulf of Mexico. In 1987, Geodyne acquired a ten-percent, non-operating working interest in the lease. In 1996, XPLOR Energy Operating Co. (XPLOR) acquired 14.79% of the lease and became the operator of the well on the lease, assuming responsibility for the physical operation of the well. Geodyne did not have responsibility for the daily operation of the well on the lease, but was responsible for paying ten percent of the operating costs and received ten percent of any revenues from the sale of oil and gas produced from the lease.

The lease contained a five-year primary term and then remained in effect so long as oil or gas was produced in paying quantities. If the well stopped producing oil or gas in paying quantities, the lessee could keep the lease in effect by beginning additional drilling or reworking operations within sixty days. On December 10, 1996, the well stopped producing oil and gas in paying quantities. XPLOR did not begin reworking or drilling operations on the lease within sixty days. Despite periodic attempts to restart the well, it never again produced oil or gas in paying quantities.

On December 10, 1997, Geodyne sold through a third-party auctioneer its ten-percent working interest in the lease, the well, and the equipment associated with the well to Newton for $300. In the sale documents, Newton agreed Geodyne had made no representations or warranties regarding oil and gas production; marketable title; condition; quality; fitness for general or particular purpose; merchanta-

bility; accuracy of interest; or accuracy or completeness of any data, information, or material supplied to Newton. Newton also agreed to take the conveyed property "as is."

In August 1998, XPLOR completed plugging and abandoning the well at a cost of $742,409.67. After both Geodyne and Newton declined to reimburse XPLOR ten percent of the plugging and abandoning costs, XPLOR sued both parties.

A jury determined Geodyne was the owner of the non-operating interest in the well at the time the well was required to be plugged and awarded XPLOR the plugging costs from Geodyne. The jury also found Geodyne violated the TSA and awarded Newton $300 on its TSA claim. The parties submitted the issue of attorney's fees to the trial court on affidavit, and the trial court awarded Newton $161,269.53. Geodyne appealed.[3]

### TEXAS SECURITIES ACT

In its first point of error, Geodyne argues (1) there is legally and factually insufficient evidence of reliance or causation to support the jury's finding Geodyne violated article 581–33A(2) of the TSA or to prove Geodyne made any misrepresentation or omission of material fact and (2) Newton is not entitled to damages because it still owns the interest.

■ To recover under the TSA, a buyer must prove a security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary in order to make the statements made in light of the circumstances under which they are made not misleading. Tex.Rev.Civ. Stat. Ann. art. 581–33A(2) (Vernon Supp.2003); *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760,

776 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). An interest in or under an oil and gas lease is a security. Tex.Rev. Civ. Stat. Ann. art. 581–4A. An omission or misrepresentation is material "if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest." *Sandefer*, 58 S.W.3d at 776; *see Anheuser–Busch Cos., Inc. v. Summit Coffee Co.*, 858 S.W.2d 928, 936 (Tex.App.-Dallas 1993, writ denied), *vacated on other grounds*, 514 U.S. 1001, 115 S.Ct. 1309, 131 L.Ed.2d 192 (1995).

■ Article 581–33A(2) of the TSA is virtually identical in all relevant aspects to section 12(2) of the Federal Securities Act of 1933, 15 U.S.C.A. 77l (a)(2) (1997 & Supp.2002) (section 12(2)). *Sandefer*, 58 S.W.3d at 775; *Anheuser–Busch Cos., Inc.*, 858 S.W.2d at 939. Accordingly, we look to federal cases interpreting section 12(2) as a guide in interpreting article 581–33A(2). *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 232–33 (Tex.App.-Houston [1st Dist.] 1996, no writ).

### A. Reliance

■ Geodyne first argues the evidence is legally and factually insufficient to prove Newton relied on any misrepresentation or omission by Geodyne. However, the TSA does not require the buyer to prove reliance. *Hendricks v. Thornton*, 973 S.W.2d 348, 360 (Tex.App.-Beaumont 1998, pet. denied) (reliance is not an element of a claim under the TSA); *Summers*, 935 S.W.2d at 234 (TSA does not require plaintiff show he would not have purchased the stock if he had known of the alleged adverse material facts); *Anheuser–Busch Cos., Inc.*, 858 S.W.2d at 936 ("An investor is not required to prove that he would have acted differently but for the omission or

---

**3.** After filing its appeal, Geodyne resolved its dispute with XPLOR, and the judgment in favor of XPLOR is no longer part of this appeal.

misrepresentation."); *see In re Westcap Enters.*, 230 F.3d 717, 726 (5th Cir.2000).

### B. Causation

Geodyne next contends there is legally and factually insufficient evidence to establish any material misrepresentation or omission by Geodyne caused Newton to buy the interest in the lease or caused Newton's loss. We will address these issues separately.

### 1. Cause of Sale

◼ Geodyne first argues that, as a matter of law, the "as is" clause in the sale documents negates Newton's claim that any misrepresentation or omission by Geodyne caused Newton to purchase the security. This argument is "an impermissible attempt to introduce reliance upon the misrepresentations and omissions...." *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir.1970). Because reliance by the buyer on the misrepresentation or omission is not required under the TSA, a buyer is not required to prove the misrepresentation or omission caused him to purchase the security. *See Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 648–49 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.); *Anheuser–Busch Cos., Inc.*, 858 S.W.2d at 936.

The authority relied upon by Geodyne does not support the proposition that the TSA requires the buyer to prove the misrepresentation or omission caused the purchase. *Pitman v. Lightfoot*, 937 S.W.2d 496, 531 (Tex.App.-San Antonio 1996, writ denied), and *Nicholas v. Crocker*, 687 S.W.2d 365, 368 (Tex.App.-Tyler 1984, writ

ref'd n.r.e.), stand for the proposition that a statement made by the seller after the purchase of a security is not the "means" by which the security was sold and is thus insufficient to establish a violation of the TSA. Geodyne next cites to cases interpreting section 12(2), contending these cases require a causal relationship between the misrepresentation or omission and the sale of the security. These cases address whether (1) the conduct of a defendant that was not the actual seller of the security was sufficiently connected to the sale to impose liability[4] or (2) the communication was made at the time a sale was contemplated.[5]

Geodyne does not dispute it was the seller of the security or that any misrepresentation or omission was made in connection with the sale of the lease prior to the sale. This is the only "causal connection" required by the TSA. Newton is not required to demonstrate the misrepresentation or omission caused the sale to occur. *Duperier v. Tex. State Bank*, 28 S.W.3d 740, 753 (Tex.App.-Corpus Christi 2000, pet. dism'd); *Anheuser–Busch Cos., Inc.*, 858 S.W.2d at 936; *see Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 696 (5th Cir.1971) ("A causation test should not be read into ... Section [12(2)]. A plaintiff does not have to prove that the sale would not have occurred absent the misrepresentation or omission."), *disagreed with on other grounds, Pinter v. Dahl*, 486 U.S. 622, 650, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

### 2. Cause of Loss

We now turn to Geodyne's argument that there is legally and factually insuffi-

---

**4.** *See Metromedia Co. v. Fugazy* 983 F.2d 350, 361 (2d Cir.1992); *Austin v. Loftsgaarden*, 675 F.2d 168, 179 (8th Cir.1982), *rev'd on other grounds*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986); *Croy v. Campbell*, 624 F.2d 709, 715 (5th Cir.1980); *Alton Box Bd. Co. v. Goldman, Sachs & Co.*, 560 F.2d 916, 924 (8th Cir.1977).

**5.** *See Jackson v. Oppenheim*, 533 F.2d 826, 830 (2d Cir.1976); *Eriksson v. Galvin*, 484 F.Supp. 1108, 1125 (S.D.N.Y.1980).

cient evidence that any misrepresentation or omission caused Newton's loss. Article 581–33A(2) does not require the buyer to prove the misrepresentation or omission caused his injury. *Duperier,* 28 S.W.3d at 753 ("Loss causation is not an element of or a defense to a claim brought under [article 581–33A(2) ] of the [TSA]."); *see Gasner v. Bd. of Supervisors,* 103 F.3d 351, 360 n. 10 (4th Cir.1996); *Casella v. Webb,* 883 F.2d 805, 808 (9th Cir.1989) (" '[t]he buyer need not show any causal connection between the misrepresentation and his damage; indeed, he need not even show that he has been damaged.' " (citation omitted)).

A comparison of the language of section 12(2) and 581–33A(2) supports this construction. Historically, loss causation was not an element of a section 12(2) claim. *Gasner,* 103 F.3d at 360 n. 10. However, in 1995, Congress amended section 12(2) to specifically provide that the portion or amount of the loss attributable to something "other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication ... not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading" was not recoverable. 15 U.S.C.A. § 77*l* (b). Accordingly, section 12(2) now requires a showing of causation for the loss. Article 581–33 has not been similarly amended.

We conclude that in bringing a claim under article 581–33A(2), a buyer of a security is not required to prove the misrepresentation or omission of material fact caused his injury.

*C. Remedy*

■ Geodyne next complains the trial court erred in entering judgment for Newton because a party may recover money damages against a seller only when the buyer no longer owns the security. Geodyne contends that because Newton still owns the security, it is limited to rescission of the sale and Newton waived its right to rescission by dropping rescission as a cause of action.

■ Under the TSA, a buyer may only recover damages if he no longer owns the security. TEX.REV.CIV. STAT. ANN. art. 581–33D; *Anheuser–Busch Cos., Inc.,* 858 S.W.2d at 939. If the buyer still owns the security, he can only seek to rescind the transaction. *Anheuser–Busch Cos., Inc.,* 858 S.W.2d at 939. However, in this case, "the distinction between the two remedies may be relatively unimportant." *Id.* at 939 n. 6. The jury awarded Newton $300 on its claim under the TSA. If the transaction is rescinded, Newton is entitled to the $300 purchase price.

Under the quitclaim deed from Geodyne, Newton received whatever interest, if any, Geodyne had in the lease. Newton is still the owner of record of this interest. Consequently, Newton owns the security and is entitled only to rescind the transaction.

■ Newton did not waive its right to seek rescission either by not submitting the issue to the jury or by deleting its rescission cause of action from its Seventh Amended Cross–Claim. First, whether a remedy exists under a statute is a question of law. *Wal–Mart Stores, Inc. v. McKenzie,* 997 S.W.2d 278, 280 (Tex.1999). Thus, a jury's finding on the availability of rescission would be immaterial. *Id.* Second, Newton alleged in its Seventh Amended Cross–Claim that it was "entitled to the remedies identified in art. 581–33(D)" and prayed for damages or "in the alternative" for rescission.

After the jury determined Geodyne violated the TSA, the trial court had no discretion under the statute on whether to rescind the transaction. *See* TEX.REV.CIV.

STAT. ANN. art. 581–33A(2). We are empowered to modify, correct, or reform the judgment of the trial court. TEX.R.APP. P. 43.2(b); *Welkener v. Welkener,* 71 S.W.3d 364, 368 (Tex.App.-Corpus Christi 2001, no pet.). We therefore modify the judgment of the trial court to reflect that the sales transaction is rescinded and that Newton is entitled to recover from Geodyne the $300 purchase price plus interest thereon at the legal rate from the date of payment. *See* TEX.REV.CIV. STAT. ANN. art. 581–33D(1).

### D. Misrepresentation or Omission

■ Geodyne's final argument in support of its first point of error is the evidence is legally and factually insufficient to support the jury's finding Geodyne made a misrepresentation or omission of material fact. Relying on the Texas Supreme Court's holding in *Prudential Insurance Co. of America v. Jefferson Associates, Ltd.,* 896 S.W.2d 156 (Tex.1995), Geodyne contends the "as is" clause in the sale agreement conclusively negates the claim Geodyne made any representations, much less misrepresentations, and without representations there can be no omissions.

*Prudential* does not control the applicability of an "as is" clause to a claim brought under the TSA. The "as is" clause in *Prudential* negated causation, an element of a claim under the Texas Deceptive Trade Practices Act. TEX. BUS. & COM. CODE ANN. § 17.50(a) (Vernon 2002); *Prudential Ins. Co. of Am.,* 896 S.W.2d at 161. As discussed above, the TSA does not require proof that the misrepresentation or omission either caused the buyer to purchase the security or caused the buyer's loss. Thus, an "as is" clause does not affect a claim brought under article 581–33A(2).

■ Further, any "condition, stipulation, or provision binding a buyer" of a security "to waive compliance with a provision of [the TSA] or a rule or order or requirement hereunder is void." TEX.REV. CIV. STAT. ANN. art. 581–33L (Vernon Supp. 2003). Under both section 12(2) and article 581–33L, violations of the securities law may only be released or waived when (1) the claims are mature and based on past violations of the securities law and (2) the releasing party has actual or constructive knowledge of the claims. *Anheuser–Busch Cos., Inc.,* 858 S.W.2d at 934–35. Accordingly, the inclusion of an "as is" or waiver clause in the sale agreement for a security does not release or waive any cause of action the buyer may have for a current violation of the TSA of which the buyer has neither actual nor constructive knowledge. *See Anheuser–Busch Cos., Inc.,* 858 S.W.2d at 933, 935 (release of all claims that parties "have or might have, known or unknown, now existing or that hereafter directly or indirectly be attributable to ... the above-recited disputes and controversies" did not release securities law claims when party did not have actual or constructive knowledge of claim at time release was executed).[6]

■ Geodyne represented it was selling a ten-percent working interest in the oil and gas lease. The well on the lease

---

**6.** Geodyne also argues that under the terms of the auction and pursuant to the sales agreement, Newton was required to perform its own due diligence both before and after the sale. Accordingly, Newton should have known the lease had possibly expired and sought to terminate the sale pursuant to the sales agreement. However, Newton is not required to establish its own due diligence to prevail on its TSA claim. *Duperier,* 28 S.W.3d at 745 ("The investor has no duty of due diligence; the statute merely requires proof of a misrepresentation or omission by the seller."); *Summers,* 935 S.W.2d at 234; *see In re Westcap Enters.,* 230 F.3d at 726.

ceased producing oil and gas in paying quantities on December 10, 1996. Because XPLOR failed to conduct reworking operations on the well within sixty days, the lease expired by its own terms. In December 1997, there was no lease in which Geodyne could sell a working interest.

While Newton was aware of a lack of production from the well, it did not know the lease had expired. Pete Spiros, Newton's president, testified Newton would not have purchased the property if he had known the lease had expired. Alan Smith, a former vice-president of XPLOR, testified Geodyne received joint interest billing statements for 1996 that would inform a sophisticated oil and gas purchaser that no reworking operations had been performed on the lease and that there was a potential problem with the lease. These statements were not provided to Newton.

The evidence is both legally and factually sufficient to support the jury's finding that Geodyne omitted a material fact that was necessary to make Geodyne's statement it owned a ten-percent working interest in the lease not misleading. There was ample evidence that information indicating the lease had expired would be material to a reasonable investor in determining whether to purchase the lease. *Sandefer*, 58 S.W.3d at 776. Further, the jury's finding Geodyne violated the TSA is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

We overrule Geodyne's first point of error.

### Non-Operator of the Well

In its second point of error, Geodyne contends there is legally and factually insufficient evidence to support the jury's finding that Geodyne was the non-operator of the well at the time it was required to be plugged. Geodyne argues Texas Railroad Commission rules require only that plugging operations on a dry or inactive well be commenced within a period of one year after drilling or operations cease. Geodyne claims the evidence established operations continued on the well until August 1997 and, therefore, the well was not required to be plugged until August 1998. In August 1998, Newton would have owned the ten-percent interest in the well.

Statutory construction is a question of law. *Argonaut Ins. Co. v. Baker*, 87 S.W.3d 526, 529 (Tex.2002). We construe statutes as written and, if possible, determine the legislature's intent from the statute's language. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex.1999). We must consider the statute in its entirety, including the consequences that would follow from each proposed construction. *Atascosa County v. Atascosa County Appraisal Dist.*, 990 S.W.2d 255, 258 (Tex.1999). So long as another reasonable interpretation exists, we are required to reject an interpretation of a statute that defeats the purpose of the legislation. *Id.*

The owner of an interest in a well is statutorily required to plug the well. Tex. Nat. Res.Code Ann. §§ 89.002(a)(2) & (3), 89.011, & 89.012 (Vernon 2001 & Supp. 2003). A "well," in relevant part, is a hole drilled for the purpose of producing oil or gas. Tex. Nat. Res.Code Ann. § 89.002(a)(1) (Vernon Supp.2003). On December 10, 1996, an "operator" was a "person who is responsible for the physical operation and control of the well at the time the well is about to be abandoned or ceases operation." Act of June 18, 1993, 73rd Leg., R.S., ch. 882, 1993 Tex. Gen.

Laws 3505, 3505 (amended Sept. 1, 1997).[7] A "nonoperator" is a "person who owns a working interest in a well at the time the well is required to be plugged pursuant to commission rules and is not an operator as defined in Subdivision (2) of this subsection." TEX. NAT. RES.CODE ANN. § 89.002(a)(3). Each non-operator is liable to the operator for a proportionate share of the plugging expenses. *Id.* § 89.081 (Vernon 2001). A non-operator is liable for the plugging expenses if it owned the interest at the time the well was "required to be" or "should have been" plugged. *Id.* §§ 89.002(a)(3), 89.083(g)(2) (Vernon Supp. 2003).

The statutory scheme requires an operator to begin plugging operations on a dry or inactive well within one year after drilling or operations cease. *Id.* § 89.011(a) (Vernon Supp.2003); 16 TEX. ADMIN. CODE § 3.14(b)(2) (1995) (Tex.R.R. Comm'n, Plugging); *Serna v. State*, 877 S.W.2d 516, 518 (Tex.App.-Austin 1994, writ denied). Neither the statute nor the implementing rules define "inactive well" or "operations." However, an "inactive well" is indirectly defined in the definition of "delinquent inactive well" as a well with no reported production, disposal, injection, or other permitted activity. TEX. NAT. RES.CODE ANN. § 89.002(a)(7). Further, "operations" refers to the well producing oil and gas, not mechanical operations on the well itself. *See id.* § 89.011 (operator has duty to plug well that has "ceased operation"); Act of June 18, 1993, 73rd Leg., R.S., ch. 882, 1993 Tex. Gen. Laws 3505, 3505 (operator determined at time well ceased operation).

Accordingly, the operator of a well has a statutory duty to commence plugging operations within twelve months of the date a well ceased producing oil or gas. *See In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 438 n. 3 (5th Cir.1998) (operator has one year to commence plugging operations or be in violation of statute). This duty can, of course, be alleviated if, due to actions taken by the operator, the well began producing oil and gas during that twelve-month period. A non-operator is liable for its proportionate share of the plugging costs if it owned the interest at the time the well ceased operation. TEX. NAT. RES. CODE ANN. §§ 89.002(a)(2), (3); 89.083(g).

We decline to adopt Geodyne's position that "operation" means any mechanical operation on the well. This interpretation eviscerates the statute's intent that inactive wells be plugged within twelve months of when the well ceases producing oil and gas. Geodyne's reading of the statute would allow any operation on an inactive well to extend the duty to plug the well indefinitely. *See Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 438 (Tex.App.-Amarillo 1993, no writ) ("[C]ourts have required that activities conducted by the lessee to maintain the lease must be of a nature that would cause the well to produce."). After a well becomes inactive, an operator is allowed one year to either restore production from the well or commence plugging operations.

The jury determined Geodyne was the non-operator of the well at the time the well was required to be plugged. Smith testified the well ceased producing oil and

---

7. Effective September 1, 1997, the legislature amended the definition of operator:

'Operator' means a person who assumes responsibility for the physical operation and control of the well as shown by a form the person files with the commission and the commission approves. . . .

Act of May 15, 1997, 75th Leg., R.S., ch. 89, 1997 Tex. Gen. Laws 176, 176. It is undisputed XPLOR was the operator of the well on December 10, 1996 under either definition.

gas in paying quantities on December 10, 1996 and that XPLOR performed no reworking operations on the well after that date. If this were true, the duty to plug the well arose on December 10, 1996, and XPLOR, as the operator of the well, was required to commence plugging operations before December 10, 1997. Geodyne owned the non-operating interest in the well during this time period. Thus, there is more than a scintilla of evidence to support the jury's finding in response to question one that Geodyne was a non-operator in the well at the time the well was required to be plugged.

Turning to Geodyne's factual sufficiency complaint, Smith also testified that XPLOR turned the well on periodically to determine if there was sufficient pressure to cause the well to once again produce oil or gas in paying quantities. Smith further testified XPLOR attempted to clean the well and performed a slick line operation to attempt to repair the storm choke valve. While Smith admitted that if this valve had been defective and was repaired, the well might have started producing, he also testified there was nothing wrong with the valve, and the well did not produce oil or gas following the slick line operation. Considering all the evidence, we conclude there is factually sufficient evidence that the well ceased operation in December 1996 and that Geodyne was a non-operator in the well at the time the well was required to be plugged.

We overrule Geodyne's second point of error.

### ATTORNEY'S FEES

■ In its third point of error, Geodyne argues the trial court erred in awarding attorney's fees to Newton because (1) the fees were not reasonably related to the amount in controversy and (2) Newton failed to segregate the fees between the parties and between claims for which fees are authorized and claims for which fees are not authorized. The parties submitted the issue of attorney's fees to the court on affidavit.

■ A trial court may award attorney's fees only if they are reasonable and necessary for the prosecution of the suit. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991). To show the reasonableness and necessity of attorney's fees, the claimant must show the fees were incurred on a claim that allows recovery of such fees while suing the party sought to be charged with the fees. *Id.* Generally, when a claimant seeks to recover attorney's fees in a case where there are multiple parties, and one or more of those parties have made settlements, the claimant must segregate the fees owed by the remaining parties from those owed by the settling parties so that the remaining parties are not charged fees for which they are not responsible. *Id.* at 10–11. "Likewise, when one or more causes of action for which attorney's fees are not permitted by statute or contract are alleged in a petition, and are investigated, and pursued at trial, it is incumbent upon the party asserting those causes of action to segregate them from those for which attorney's fees can be recovered." *Aetna Cas. & Sur. v. Wild,* 944 S.W.2d 37, 40–41 (Tex. App.-Amarillo 1997, writ denied). The exception to this duty to segregate arises when the attorney's fees are incurred in connection with claims arising out of the same transaction and are so interrelated that the prosecution or defense of such claims entails proof or denial of essentially the same facts. *Sterling,* 822 S.W.2d at 11.

In support of its claim for attorney's fees, Newton offered the affidavits of Jeffrey C. King, Newton's trial counsel, in which he testified regarding the hours worked by Newton's attorneys that resulted in total fees and expenses of $161,269.53. King also opined that it was not possible to segregate the fees (1) between work performed defending XPLOR's claims from work performed on the cross-claims against Geodyne or (2) between causes of action. Based on this opinion, Newton argues it falls within the exception of the duty to segregate. Geodyne contends King's opinion is conclusory and not supported by the evidence.

The evidence does not establish the attorney's fees are incapable of segregation. For example, Newton's TSA claim was not filed until approximately eighteen months after XPLOR filed suit, and Newton has offered no evidence or authority it should be awarded attorney's fees under the TSA for work that was performed prior to Newton's filing a claim under the TSA. Further, the record reflects Newton was required to defend a claim brought by XPLOR based on a sworn account. This claim, as well as Newton's cross-claim based on misrepresentations of the amount of production from the well, were resolved through summary judgment, and there is no evidence these claims were inextricably intertwined with Newton's remaining contentions. Newton also brought cross-claims under the DTPA and for negligent misrepresentation, breach of contract, and rescission that were not pursued at trial. These claims have significantly different elements than a claim under the TSA, and there is no evidence that work relating to those claims could not be segregated. *See Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture*, 50 S.W.3d 531, 551 (Tex.App.-El Paso 2001, no pet.).

We do not mean to imply that the trial court need find that any of the listed areas of fees, or others that are not apparent from a quick review of the record, are capable of being segregated. We conclude only that Newton failed to carry its burden of proof that the fees could not be segregated. The determination of reasonable attorney's fees is a question for the trier of fact. *Sterling*, 822 S.W.2d at 11. Therefore, we sustain Geodyne's third point of error and remand the attorney's fees issue to the trial court for further consideration.

## INDEMNIFICATION

In its final point of error, Geodyne contends the trial court erred in denying Geodyne's claim for indemnification under the sales agreement. Because we have concluded the transaction must be rescinded, Geodyne is not entitled to indemnification as a matter of law. Point of error four is overruled.

## CONCLUSION

We modify the trial court's judgment to order the sale be rescinded. We affirm the trial court's judgment, as modified, as to all issues other than Newton's right to recover attorney's fees under the TSA. We remand the attorney's fees issue to the trial court for further consideration.