GEODYNE ENERGY INCOME PRO-
DUCTION PARTNERSHIP I–E, Geo-
dyne Energy Income Production Part-
nership I–F, Geodyne Production
Partnership II–A, and Geodyne Re-
sources, Inc., Petitioners,

v.

The NEWTON CORPORATION,
Respondent.

No. 03–0209.

Supreme Court of Texas.

Argued Sept. 9, 2004.

Decided April 8, 2005.

Cynthia Keely Timms, Karin B. Torgerson, C. Michael Moore, Locke Liddell & Sapp, LLP, Dallas, for Petitioner.

Jeffrey C. King, Jamie Lavergne Bryan, Hughes & Luce, L.L.P., Dallas, for Respondent.

Laura Rowe, Hicks Thomas & Lilienstern, LLP, Houston, J. Robert Beatty, Locke Liddell & Sapp LLP, Dallas, Royal

B. Lea III, Bingham & Lea, P.C., San Antonio, Stephen L. Tatum, Cantey & Hanger, L.L.P., Fort Worth, Joseph R. Knight, Baker & Botts, Austin, for Amicus Curiae.

Justice BRISTER delivered the opinion of the Court.

The Newton Corporation bid $300 at an industry auction, and got a quitclaim deed of Geodyne's [1] interest in an offshore mineral lease. Six months later, Newton was informed that the lease had expired and the operator wanted reimbursement for the costs of plugging and abandoning the well. Finding a violation of section 581–33(A)(2) of the Texas Securities Act (TSA),[2] the jurors and judges below rescinded the auction sale and assessed abandonment costs against Geodyne.[3]

Since the adoption of section 33(A)(2) in 1963, this Court has never reviewed a claim against a seller under that section's private cause of action for misrepresentations in the sale of securities. The parties and several amici ask us to settle a number of questions that have arisen in the intermediate appellate courts regarding causation and affirmative defenses. But because we find the quitclaim deed here was not a misrepresentation, we must reverse the judgment below and leave those questions for another day.

## I

In 1987, Geodyne obtained several oil-and-gas interests by special warranty deed, including a 10 percent interest in a lease known as Block 87–S in the Gulf of

---

1. Petitioners Geodyne Energy Income Production Partnership I–E, Geodyne Energy Income Production Partnership I–F, Geodyne Production Partnership II–A, and Geodyne Resources, Inc. (collectively "Geodyne") are all Oklahoma general partnerships qualified to do business in Texas.

2. Tex.Rev.Civ. Stat. art. 581–33(A)(2).

3. 97 S.W.3d 779, 785–86.

Mexico. The lessor was the State of Texas, through the General Land Office (GLO). At all relevant times here, the lease operator was Xplor Energy, Inc. or a corporate predecessor (Xplor).[4]

After the primary term expired, the lease remained in effect so long as oil or gas was produced in paying quantities. By December 1996, production had dwindled below that amount. Nevertheless, the lease provided for extension if reworking operations were begun within 60 days and continued without interruptions totaling more than 60 days.

In June 1997, Xplor wrote the GLO that it was "currently evaluating what further additional measures can be taken to restore production." On October 28, 1997, the operator's landman wrote the GLO detailing efforts in the last six months "to flow the well," and requesting that "before approving the necessary expenditures for the recompletion, our management would like an opinion from the GLO that the lease is still in effect."

The GLO did not respond for several months, but in an internal memo the landman recorded his impression that the GLO "does not appear to be overly concerned with the lack of production from the lease," and that "[i]f we restore production in paying quantities no later than 12 months after its cessation, the GLO should be satisfied on this point."

None of this was communicated to other interest owners. Throughout 1997, Xplor continued to send out joint interest billing statements, and Geodyne continued paying them.

On October 21, 1997, Geodyne contracted with an industry auctioneer to sell nearly thirty properties, including its interest in the Block 87–S well, without reserve. At the auction on December 9, 1997, Newton bought this interest for $300.

On March 4, 1998, almost three months later, an interoffice memo indicates the GLO told Xplor for the first time that the lease had expired and the well needed to be plugged. But Xplor did not notify the other interest holders in the lease until July 1998, at which time it asked for payment of each owner's proportionate share "at your earliest convenience."

Both Newton and Geodyne refused to pay. Xplor sued both to recover 10 percent of its plugging costs—$72,240.95.

The case was tried to a jury, which assessed the plugging costs against Geodyne, as well as $300 for Geodyne's violation of the TSA. Attorney's fees were tried to the trial judge, who awarded Newton $161,269.53 plus additional amounts for appeal.

After the trial, Geodyne settled with Xplor, but appealed the remainder of the judgment. The court of appeals generally affirmed, reversing only the fee award for failure to segregate recoverable from unrecoverable fees.[5] Geodyne now seeks review of that portion of the court of appeals' judgment rescinding the parties' contract under the TSA, and denying Geodyne's claim for reimbursement of the plugging costs.

## II

### A

Section 581–33(A)(2) imposes liability on "[a] person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a

---

4. Xplor bought Araxas Exploration, Inc. in September 1997. Araxas had been the operator since September 1996.

5. 97 S.W.3d at 790.

material fact."[6] The statute defines "security" to include interests in oil and gas leases.[7]

The misrepresentation Newton alleged here had nothing to do with the plugging costs that (except for attorney's fees) made up most of the judgment. Newton's President, Pete Spiros, admitted knowing that interest owners must pay their share of plugging costs whenever a well stops producing,[8] and that all wells eventually do.

Instead, the only misrepresentation Newton pleaded or tried to prove was that Geodyne represented it was selling a 10 percent interest in a valid lease.[9] Newton bases its claim on an auction catalog and an accompanying well-data-profile sheet identifying the property as "ST 87–S 1" and showing "GWI.10000000."[10] It is undisputed there were no other communications or representations—Newton made no inquiries of Geodyne, and no one from Geodyne attended the auction.

**6.** Tex.Rev.Civ. Stat. art. 581–33(A)(2).

**7.** *Id.* art. 581–4(A).

**8.** *See* Tex. Nat. Res.Code §§ 89.011, 89.012, 89.081.

**9.** Newton also asserted at trial that the auction documents represented the seller as Samson Resources Co. (Geodyne's owner) rather than Geodyne. But the transfer documents Newton signed indicated the correct owner, and no evidence was presented at trial that this error was material. *See* Tex.Rev.Civ. Stat. art. 581–33(A)(2) (providing liability only for material misrepresentations).

**10.** Though not defined in the auction materials, "GWI" represents gross working interest—a percentage share of all expenses and revenues (the latter subject to royalties) in the well plus any royalties attributable to the working interest. *See* 8 Howard R. Williams & Charles J. Meyers, Oil & Gas Law, Manual Of Terms 474, 1191 (2004) (citing the Energy Info. Admin. (of the U.S. Dep't of Energy))

**B**

Geodyne argues there was no representation of valid title here because the sale to Newton was by quitclaim deed. Even though Geodyne obtained its interest by special warranty deed, it asserts it never purported to sell anything other than the interest it had, *if any*, at the time of the auction.

 A warranty deed to land conveys property; a quitclaim deed conveys the grantor's rights in that property, if any.[11] We have long recognized the validity of quitclaim deeds, even if it turns out that they convey nothing.[12] In deciding whether an instrument is a quitclaim deed, courts look to whether the language of the instrument, taken as a whole, conveyed property itself or merely the grantor's rights.[13]

 Here, the parties' Assignment and Bill of Sale identified the lease, but never stated the nature or percentage interest that was being conveyed. Instead, it (1)

(glossary *at* http://www.eia.doe.gov/) (last visited Apr. 5, 2005). While one listing in the materials showed a lower share after payout, it was clear that this well had not yet paid out, as an attachment showed costs of $1,857,449.95 and revenues of $1,475,504.63.

**11.** *Cook v. Smith*, 107 Tex. 119, 174 S.W. 1094, 1095 (1915).

**12.** *See, e.g., Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 769 (Tex.1994); *Garrett v. Christopher*, 74 Tex. 453, 12 S.W. 67, 67 (1889); *Laurens v. Anderson*, 1 S.W. 379, 380 (Tex. 1886); BLACK'S LAW DICTIONARY 1126 (8th ed.2004) (defining quitclaim deed as "[a] deed that conveys a grantor's complete interest or claim in certain real property but that neither warrants nor professes that the title is valid").

**13.** *Porter v. Wilson*, 389 S.W.2d 650, 654 (Tex. 1965); *Cook*, 174 S.W. at 1094; *Threadgill v. Bickerstaff*, 87 Tex. 520, 29 S.W. 757, 758 (1895).

conveyed to Newton "all of [Geodyne's] right, title, and interest" in the described lease "AS IS, AND WHERE IS, WITHOUT WARRANTY OF MERCHANTABILITY," (2) provided that "this Assignment hereby conveys to Assignee ... all of Assignor's right, title, and interest on the effective date hereof in and to the Property," and (3) concluded in the habendum clause that the assignment was "WITHOUT WARRANTY OF TITLE, EITHER EXPRESS OR IMPLIED." As a matter of the law, this was a quitclaim deed.

## C

Although the court of appeals recognized this fact,[14] it nevertheless found Geodyne misrepresented that it was selling a 10 percent working interest in a valid lease, when in fact the lease had expired.[15] For four reasons, we disagree.

■ First, a 10 percent interest is exactly what Newton got. While the lease may have expired before the auction, the rights and duties of interest owners thereunder had not; indeed, it is precisely the 10 percent share of plugging costs that Newton is trying to avoid. Shortly after the auction, Newton recorded its interest, and it remained the owner of record until the time of trial. Newton requested and received a division order from Xplor listing Newton as an interest holder. Just because Newton got a 10 percent interest in liabilities rather than assets, that does not

make the catalog listing a misrepresentation.

■ Second, as purchaser of a quitclaim deed, Newton cannot claim the deed itself was a misrepresentation that the lease was valid. Quitclaim deeds are commonly used to convey "interests of an unknown extent or claims having a dubious basis."[16] A quitclaim deed conveys upon its face doubts about the grantor's interest; any buyer is necessarily put on inquiry as to those doubts.[17] Thus, a quitclaim deed *without warranty of title* cannot be a warranty (or "misrepresentation") of title.[18]

■ That is not to say quitclaim deeds can never constitute misrepresentation. Despite the merger doctrine, prior agreements are not merged into a realty deed in cases in which a quitclaim deed is signed due to fraud, accident, or mistake.[19] Similarly, the merger doctrine may not prevent proof of prior misrepresentations under the Deceptive Trade Practices–Consumer Protection Act.[20] But as there was no evidence that anything other than a quitclaim deed was ever contemplated by the parties here, there is nothing to show Geodyne ever represented the validity of the underlying lease.

■ Third, the terms of the auction itself prevent any claim that Geodyne represented the lease was valid. The auction here was not open to the general public. To gain access, Newton's president had to

---

14. 97 S.W.3d at 785.

15. *Id.* at 786–87.

16. *Porter,* 389 S.W.2d at 654.

17. *Richardson v. Levi,* 67 Tex. 359, 3 S.W. 444, 447–48 (1887).

18. *McIntyre v. De Long,* 71 Tex. 86, 8 S.W. 622, 623 (1888) ("Ordinarily, when a vendee accepts a quitclaim deed ... the presumption of law is that he acts upon his own judgment

and knowledge of the title, and he will not be heard to complain that he has not acquired a perfect title.")

19. *Commercial Bank, Unincorporated v. Satterwhite,* 413 S.W.2d 905, 909 (Tex.1967); *McIntyre,* 8 S.W. at 623.

20. *Alvarado v. Bolton,* 749 S.W.2d 47, 48 (Tex.1988).

warrant that he had substantial experience and investments in the oil and gas business, and signed a two-page "Buyer's Terms and Conditions of the Sale" that stated:

- DUE DILIGENCE IS REQUIRED PRIOR TO BIDDING ON ANY PROPERTIES. BIDDER UNDERSTANDS AND AGREES THAT EBCO [the auctioneer] AND SELLER MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, ON THE PROPERTY LISTED FOR SALE AS TO ITS OIL AND/OR GAS PRODUCTION, MARKETABLE TITLE, CONDITION, QUALITY, FITNESS FOR GENERAL OR PARTICULAR PURPOSE, MERCHANTABILITY, OR OTHERWISE....

- All descriptions of properties in the sale, including any published in sale brochures or promotional material, have been supplied by Seller for the sole purpose of identifying such properties ... Well data and other information provided by Seller is intended solely as a guide for Bidder due diligence and is not a warranty or guarantee of any kind whatsoever.

- ALL INTERESTS BEING CONVEYED MUST BE VERIFIED BY BIDDER. Neither Seller nor EBCO warrants or guarantees the accuracy of such interests.

- BIDDER ACKNOWLEDGES THAT HE HAS REVIEWED AND UNDERSTANDS THE TERMS OF THE SELLER'S CONVEYANCING DOCUMENTS.

Having agreed to these terms to get into the auction, and having paid a mere $300 for a quitclaim deed without warranty of title, Newton cannot now claim the listing of "GWI.10000000" was a representation of the validity of the lease.

▮ Fourth, Newton admitted reviewing well files for the property showing virtually no production for January through June 1997. Also available at the auction was a Lease Income and Expense Summary showing "$0" spent for workover operations.[21] Immediately before the auction itself, an auctioneer announced that the well had no production. In this context, the identification of "GWI.10000000" did not reasonably imply anything about the status of the lease.

## D

▮ Newton raises two additional reasons why section 581–33 requires rescission of the sale. First, Newton points out that the section renders void any contractual provision requiring a buyer to waive compliance with the TSA.[22] Second, it points to the explicit provision in section 581–33(A)(2) of a defense to sellers if an alleged misrepresentation (a) was known to the buyer, or (b) could not reasonably have been discovered by the seller.[23] Newton argues the first renders void the warnings in the auction documents, and the second impliedly prohibits a defense based on a misrepresentation that *neither* party knew was false but *both* might have discovered.

But before either of these statutory arguments come into play, there must be

---

21. Newton points out that Geodyne omitted from the well file at the auction the joint interest billings on the well that would have shown no drilling or reworking operations were ongoing. But it was undisputed that the same information was included in the Lease Income and Expense Summary, which Newton had.

22. Tex.Rev.Civ. Stat. art. 581–33(L).

23. *Id.* art. 581–33(A)(2).

some evidence of a misrepresentation. By offering only a quitclaim deed, Geodyne *disclosed* that what it was selling might turn out to be nothing. The deed and documents here show that—viewing the entire transaction in context—there was no misrepresentation, not that Newton waived its right to assert one or that Geodyne had an affirmative defense against it.[24]

### E

We recognize there is some tension between the concepts behind quitclaim deeds and Blue Sky laws.[25] From inception, the latter were intended at least in part to curb oil-drilling investment schemes based on leases that existed only in the wild blue yonder.

■■ But both long before and long after the TSA was enacted, Texas law also recognized the validity and utility of quitclaim deeds. Indeed, the State itself sometimes uses them.[26] If Newton is correct in this case, then non-operating mineral interests can *never* be sold by quitclaim deed in Texas—a seller must either warrant title directly, or will be held to have done so indirectly by application of the TSA. We do not believe that is what the Legislature intended.

In 1983, the Legislature amended the TSA to provide that its purpose was not only "to protect investors," but consistent with that purpose "to encourage capital formation, job formation, and free and competitive securities markets and to minimize regulatory burdens on issuers and persons subject to this Act, especially small businesses."[27] Construing the TSA to outlaw quitclaim deeds would have serious consequences for jobs, markets, issuers, and small businesses, for several reasons.

■■ First, it is often difficult to tell whether a mineral interest has expired. Depending on the terms of each lease, expiration may turn on contingencies and activities that are controlled by others, difficult to ascertain, and (as our own docket shows) hotly disputed.[28] Even if a lease has expired, it may be ratified and revived by the lessor.[29] If mineral interests must be sold with warranty of title, many will be held in unproductive hands solely because the holder cannot afford the risk of sale.

Second, oil and gas leases are often held in fractional interests much smaller than those typical of other property.[30] As production and prices wax and wane, some interests will have exceedingly small financial value. As a result, the income from

---

24. *Cf. Prudential Ins. Co. of Am. v. Jefferson Assocs.,* 896 S.W.2d 156, 163–64 (Tex.1995) (holding "as is" clause was not a waiver of Texas Deceptive Trade Practices–Consumer Protection Act).

25. BLACK'S LAW DICTIONARY (8th ed.2004) (noting that appellation "blue-sky law" has "several suggested origins").

26. *See, e.g.,* TEX. TRANS. CODE § 202.025(4)-(5); TEX.REV.CIV. STAT. art. 5421d.

27. TEX.REV.CIV. STAT. art. 581–10–1(B).

28. *See, e.g., Ridge Oil Co. v. Guinn Invs., Inc.,* 148 S.W.3d 143 (Tex.2004); *Natural Gas Pipeline Co. of Am. v. Pool,* 124 S.W.3d 188

(Tex.2003); *Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550 (Tex.2002); *Concord Oil Co. v. Pennzoil Exploration & Prod. Co.,* 966 S.W.2d 451 (Tex.1998).

29. *See Westbrook v. Atlantic Richfield Co.,* 502 S.W.2d 551, 553 (Tex.1973).

30. *See, e.g., Freeman v. Samedan Oil Corp.,* 78 S.W.3d 1, 8 n. 7 (Tex.App.-Tyler 2001, pet. granted, cause remanded w.r.m.) (noting that complainants' interest was 0.001296 on surface-acreage basis but only 0.000020 and 0.000061 under waterflood unit agreement).

such interests may not justify the cost of monitoring their current status.

Third, we long ago recognized that while deeds are usually drafted by grantors, mineral leases are usually drafted by lessees, whose primary interest is ensuring that the lessee gets everything the lessor has.[31] Quitclaim deeds must be viewed in this context—not as means for unscrupulous sellers to sell *nothing*, but for sophisticated and willing buyers to make sure they buy *everything*.

While some might question the value of a commodity auction with so little potential value and so great potential risks, that is clearly not the view of the many companies who frequent them. According to its amicus brief, the Oil and Gas Asset Clearinghouse is the largest auction of mineral interests in the United States, closing more than 22,500 transactions involving hundreds of thousands of interests over the last ten years. Having chosen to play in such a market with such rules, the evidence here does not justify releasing Newton from its bargain.

A different question might be presented if there were evidence that Geodyne knew this lease had lapsed, or knew of an undisclosed and unexpected potential liability, but induced Newton to bid anyway by representing just the opposite.[32] But the jury found neither fraud nor fraudulent inducement here. As nothing in the Assignment or the auction documents represented that the lease had not expired, we hold that Geodyne's sale by quitclaim deed did not violate the TSA.

## III

Because the court of appeals rescinded Geodyne's sale to Newton, it declined to enforce that part of their Assignment allocating expenses like the plugging costs at issue here.[33] Due to our opposite conclusion, we reach the opposite result.

The jury found that Geodyne was the interest owner when state law required the well to be plugged. But the parties here agreed that Newton would be liable for *all* expenses after the auction, *regardless* of which party was liable under state law:

> *Assignee shall* (i) upon closing, but effective as of the effective date hereof, *assume* and be responsible for and comply with all duties and obligations of Assignor, ... including, without limitation, those arising under or by virtue of any lease, contract, agreement, document, permit, applicable statute or rule, regulation, or order of any governmental authority (specifically including without limitation, any governmental request or *requirement to plug, re-plug, and/or abandon any well* of whatsoever type, status or classification, or take any clean-up or other action with respect to the Property) and (ii) defend, indemnify and hold Assignor harmless from any and all claims in connection therewith, *except any such claims asserted against Assignor prior to the effective date hereof*. . . . (Emphasis added).

It is undisputed that Xplor first asserted its claims for plugging costs six months after the effective date of the parties' auction and sale. The provision above is not

---

**31.** *McMahon v. Christmann*, 157 Tex. 403, 303 S.W.2d 341, 346 (1957).

**32.** *See Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 162 (Tex.1995) (stating that "as is" clause is not binding if induced by fraud or if buyer's inspection is impaired).

**33.** 97 S.W.3d at 790; *see* Tex.Rev.Civ. Stat. art. 581–33(K) ("No person who has made or engaged in the performance of any contract in violation of any provision of this Act ... may base any suit on the contract.")

ambiguous, and thus did not need to be submitted to the jury.[34]

The trial court submitted the issue to the jury with instructions that Newton did not breach the agreement if there was either mutual mistake or no meeting of minds. By answering "no" to the breach question, jurors must have found one or both.

But a quitclaim deed cannot be set aside on either basis under these facts. A person who intentionally assumes the risk of unknown facts cannot escape a bargain by alleging mistake or misunderstanding.[35] The Restatement gives the precise example of quitclaim deeds to illustrate this principle:

> A contracts to sell and B to buy a tract of land. A and B both believe that A has good title, but neither has made a title search. The contract provides that A will convey only such title as he has, and A makes no representation with respect to title. In fact, A's title is defective. The contract is not voidable by B, because the risk of the mistake is allocated to B by agreement of the parties.[36]

As the deed here purported to transfer Geodyne's interest whatever that might be, Newton's assumption that the lease was valid was neither a mutual mistake nor a mutual misunderstanding.[37]

\* \* \* \* \*

Accordingly, we reverse in part the court of appeals' judgment and render judgment that Newton take nothing on its TSA claim against Geodyne. We remand the case to the trial court to render judgment in an amount to be determined for Geodyne on its indemnification claim and for further proceedings consistent with this opinion.

**34.** *Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993).

**35.** *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex.1990).

**36.** Restatement (Second) of Contracts § 154, cmt b, illus. 1 (1981).

**37.** *Glash*, 789 S.W.2d at 264 ("The question of mutual mistake is determined not by the self-serving subjective statements of the parties' intent, which would necessitate trial to a jury in all such cases, but rather solely by objective circumstances surrounding execution of the [contract].")