# Supreme Court of Texas

---

No. 23-0024

---

ConocoPhillips Company,

*Petitioner,*

v.

Kenneth Hahn,

*Respondent*

---

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

---

**Argued September 12, 2024**

JUSTICE BUSBY delivered the opinion of the Court.

This appeal concerns the amount of royalty petitioner ConocoPhillips Company owes respondent Kenneth Hahn, who owns a non-participating royalty interest (NPRI) in production from a mineral estate leased by ConocoPhillips.  ConocoPhillips's petition asks whether Hahn's right to a 1/8 fixed share of production was reduced when Hahn either (1) ratified a subsequent lease by the owner of the mineral estate that includes its own royalty term, or (2) signed a later stipulation and cross-conveyance agreeing to accept a different royalty.  The court of

appeals held that neither the ratification nor the stipulation and cross-conveyance reduced Hahn's NPRI. We agree with the court of appeals regarding ratification but disagree regarding the stipulation.

We hold that Hahn's NPRI was not altered by the royalty term of the ratified lease, in which the fee owners of the mineral estate granted ConocoPhillips their rights to possess and extract minerals in exchange for a royalty. As we explained in *Hysaw v. Dawkins*, a non-possessory royalty interest "conveys a fixed share of production" rather than "a fraction of the total royalty interest" and thus "remains constant regardless of the amount of royalty contained in a subsequently negotiated oil and gas lease." 483 S.W.3d 1, 9 (Tex. 2016).

We also hold, however, that Hahn later reduced his NPRI by conveying part of it to the mineral fee owner in the stipulation and cross-conveyance. The court of appeals' failure to give effect to the stipulation and cross-conveyance was contrary to our recent decision in *Concho Resources, Inc. v. Ellison*, 627 S.W.3d 226 (Tex. 2021). We therefore reverse the court of appeals' judgment in part and render judgment that ConocoPhillips correctly calculated Hahn's share of proceeds from the production on the pooled unit.

## BACKGROUND

### A.    The creation of Tract A and Tract B

Following the death of their father, Kenneth Hahn and his three siblings owned varying interests in a 74.15 acre tract of land. Hahn and his brother, George, owned the tract's surface estate as cotenants while each of the four Hahn siblings owned a 1/4 undivided share of the tract's severed mineral estate.

2

In August 2002, the two brothers executed and recorded two deeds (the 2002 Partition Deeds) through which Hahn received exclusive surface ownership of the northeast 37.07 acres (Tract A) and his brother, George, received surface ownership of the southwest 37.07 acres (Tract B).

## B.    The Gips Deed and Gips Lease

Later that year, Hahn executed and recorded a general warranty deed conveying Tract A to William and Lucille Gips.  The Gips Deed includes the following reservation:

> SAVE AND EXCEPT [that] there is hereby reserved unto [Kenneth Hahn], his heirs and assigns, an undivided one-half (1/2) non-participating interest in and to all of the royalty [Kenneth] now owns, (same being an undivided one-half (1/2) of [Kenneth's] one-fourth (1/4) or an undivided one-eighth (1/8) royalty) in and to all of the oil royalty, gas royalty and royalty in other minerals in and under and that may be produced from the herein described property.

This 1/8 NPRI was for a term of 15 years, concluding in June 2017.  The deed also provides that Hahn and his heirs and assigns "shall not participate in the making of any oil, gas or mineral lease covering said property, nor shall they participate in any rental or shut-in gas well royalty to be paid under such lease."

In July 2010, the Gipses entered into an oil, gas, and mineral lease with ConocoPhillips for Tract A.[1]  The Gips Lease provides that "[t]he royalties to be paid by Lessee" on oil and gas production are "1/4th

---

[1] The actual signatory was ConocoPhillips's subsidiary, Burlington Resources Oil & Gas.  We refer to both entities collectively as ConocoPhillips.

3

of that produced and saved from said land."[2]  The lease also contains a pooling clause, which grants ConocoPhillips "the right and power to pool or combine the acreage covered by th[e] lease" and, upon pooling, requires the pro rata allocation of royalties on an acreage basis.  The lease is for a primary term of three years and "as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder or as long as this lease is continued in effect as otherwise provided herein."

The Gips Lease imposes various limits on pooling, including that "[p]rior to exercising its right to pool or unitize any part of the lease premises, [ConocoPhillips] must obtain ratification of [the] lease by all holders of outstanding royalty, if any," and that ConocoPhillips would "bear any excess royalty occasioned by [its] failure to obtain such ratification."  The lease also includes paragraphs that (1) expressly disclaim any warranty of title by the Gipses, (2) address the effect of any division orders, and (3) provide ConocoPhillips's breach of any obligation will not be grounds for canceling the lease.

### C.    The Lease Ratification and Stipulation

In July 2011, Hahn and the Gipses executed a document titled "Ratification of Oil, Gas and Mineral Lease."  The Lease Ratification recites that Hahn owns an NPRI and includes the following language:

> NOW, THEREFORE, in consideration of the premises and other valuable consideration, the receipt of which is hereby acknowledged, I, Kenneth Hahn, do hereby ADOPT, RATIFY, and CONFIRM the Lease in all of its terms and

---

[2] The Gips Lease separately provided for a 1/4 royalty on gas and for all other minerals mined and marketed from said land.

4

provisions, and do hereby LEASE, GRANT, DEMISE and LET unto [ConocoPhillips], its successors and assigns, subject to and in accordance with all of the terms and provisions of the Lease as fully and completely as if I had originally been named as Lessor in the Lease and had executed, acknowledged and delivered the same. And I do hereby agree and declare that the Lease in all of its terms and provisions are binding on me and is a valid and subsisting oil, gas and mineral lease.

According to Hahn, ConocoPhillips later approached him about the need to formally clarify certain aspects of the royalty interest he reserved in the Gips Deed. The resulting "Stipulation of Interest," which Hahn and the Gipses signed on November 11, 2011, and recorded,[3] recites that the parties "wish to stipulate for the record the respective royalty interest owned by Kenneth Hahn in and to the Subject Lands." The Stipulation also provides that

for and in consideration of the premises, and other valuable considerations, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned does hereby acknowledge, stipulate and agree that it was the intent of the parties in the deed from Kenneth Hahn to William Paul Gips and Lucille Fay Gips, recorded in Volume 121, Page 625, Official Public Records, DeWitt County, Texas, that the interest reserved was a one-eighth (1/8) "of royalty" for a term of 15 years from June 9, 2003.

To effectuate the purposes of this Stipulation of Interest, each of the parties hereto does hereby grant, bargain, sell, convey, quitclaim and deliver unto each of the other respective parties any interest in the Subject Interest (as herein stipulated) necessary to vest in each of said respective parties the interest set opposite their name above, together with all rights incident thereto, to have and

---

[3] ConocoPhillips is not a signatory to the Stipulation.

5

to hold the same to each of said parties and their respective successors, heirs and assigns forever.

### D.    ConocoPhillips pools Tract A

In March 2012, ConocoPhillips amended the designation of its production unit "Maurer Unit B" to include Tract A and other surrounding land,[4] retroactive to October 1, 2011.  Hahn was provided with a division order dated May 3, 2012, which he asserts "correctly reflected" the fixed 1/8 NPRI he claims.  Several months later, a representative for ConocoPhillips called Hahn to inform him of ConocoPhillips's belief that Hahn no longer owned any interest in Tracts A or B, although Hahn claims he did not learn ConocoPhillips's reasoning at that time.

### E.    Initial proceedings in the trial court

Hahn sued Conoco and the Gipses in March 2015, asserting a multitude of claims.[5]  As relevant here, Hahn alleged a cause of action for trespass to try title to confirm his mineral ownership in Tracts A and B and sought declaratory relief.  ConocoPhillips and the Gipses each filed answers generally denying Hahn's allegations.[6]

Hahn and the Gipses filed cross-motions for summary judgment to confirm their respective ownership interests in Tract A, among other

---

[4] Maurer Unit B also included separately executed leases for Tract B.

[5] Hahn's petition also named several other individuals as necessary parties, including two of his siblings, Charles Hahn and Doris Steubing.

[6] The Gipses' answer included special exceptions to allegations regarding Hahn's entitlement to attorney's fees and pleaded the affirmative defenses of limitations, estoppel, ratification, and waiver.

6

relief. ConocoPhillips also moved to strike portions of two affidavits Hahn submitted as summary judgment evidence, arguing that they were inadmissible parol evidence.

Following a hearing, the trial court denied Hahn's motion for partial summary judgment, instead granting the Gipses' motion and striking portions of the affidavits. The trial court declared that (1) the 2002 partition deeds conveyed each brother's interest in Tracts A and B to the other brother, and (2) the Gips Deed conveyed all of Hahn's then-existing ownership in Tract A to the Gipses, except for a floating "of royalty" equal to 1/8 of the landowner's royalty set forth in any existing or future oil and gas leases.

## F.    Hahn's first appeal (*Conoco 1*)

In his initial appeal, Hahn obtained reversal of the summary judgment. *Hahn v. Gips*, No. 13-16-00336-CV, 2018 WL 771908 (Tex. App.—Corpus Christi–Edinburg Feb. 8, 2018, pet. denied) (*Conoco 1*). Hahn argued the trial court erred in construing the deeds executed in 2002 and by giving effect to the Stipulation, which Hahn argued failed as a conveyance, correction deed, or contract and did not estop him from relying on the four corners of the Gips Deed. Hahn also argued the trial court's exclusion of the affidavits constituted harmful error.

Agreeing with Hahn, the court of appeals reversed and rendered judgment in part, holding that (1) following his execution of the 2002 partition deeds, Hahn owned a one-fourth undivided interest in the mineral estate of Tracts A and B, and (2) the Gips Deed unambiguously reserved to Hahn a fixed 1/8 NPRI in Tract A. *Id.* at \*9. The court of appeals further held that the Stipulation could not be considered

7

because it was outside the four corners of the unambiguous Gips Deed, and therefore the Gipses were estopped from claiming more than a 1/4 mineral interest under the Gips Deed. *Id.* at \*8 & n.5. The court did not reach Hahn's remaining issues, including his challenge to the trial court's evidentiary ruling, and remanded to the trial court for further proceedings. *Id.* at \*9. This Court denied review.

## G. Post-remand proceedings in the trial court

The parties returned to the trial court and Hahn filed an amended petition. In addition to his previously asserted causes of action, Hahn added a claim for statutory underpayment of royalties under Chapter 91 of the Texas Natural Resources Code, contending he was entitled to additional proceeds from the sale of oil and gas attributed to Tract A and Tract B. ConocoPhillips and the Gipses each filed amended answers generally denying Hahn's allegations and asserting several affirmative defenses, including ratification.

ConocoPhillips also asserted a counterclaim for relief under the Uniform Declaratory Judgments Act (UDJA), TEX. CIV. PRAC. & REM. CODE § 37.001 *et seq.* Relying on Hahn's execution of the Lease Ratification, ConocoPhillips sought a declaration that Hahn's ratification of the Gips Lease made his share of the proceeds from production subject to the royalty stated in the lease, as well as an award of costs and reasonable attorney's fees under the UDJA. Hahn filed his original answer to ConocoPhillips's counterclaim on April 13, 2020, generally denying its allegations and pleading several affirmative defenses. In addition to challenging whether the counterclaim was

8

proper under the UDJA, Hahn alleged the counterclaim was barred by laches, waiver, estoppel, and the law of the case.

The parties filed new cross-motions for summary judgment on their competing royalty calculations for Tract A. They primarily disputed whether the royalty stated in the Gips Lease applied to Hahn's share of proceeds from the pool and the extent to which the court of appeals' decision in *Conoco 1* foreclosed certain arguments. ConocoPhillips contended that Hahn's execution of the Lease Ratification and his receipt of benefits under the Gips Lease—including the ability to receive a royalty on the entire pooled acreage of the Maurer Unit B (and not just from the unpooled Tract A)—bound him to the remaining lease terms, including its royalty provision.

Conversely, Hahn argued he had conclusively established each element of his statutory underpayment claim for royalties from production on Tract A and sought summary judgment that ConocoPhillips is liable on that claim. Hahn's motion also challenged the viability of ConocoPhillips's counterclaim under the UDJA,[7] which he argued was untimely, contrary to the law of the case, and barred by the doctrines of estoppel, waiver, and laches. On the merits, Hahn argued the "fixed" nature of his NPRI means it is not capable of being diminished by the lease's landowner royalty and that the Lease Ratification was effective only as to the lease's pooling provision.

---

[7] According to Hahn, the counterclaim was an impermissible vehicle for attorney's fees because it duplicated defensive theories already at issue and therefore sought a declaration of non-liability in tort.

9

The trial court again granted summary judgment in the defendants' favor, declaring that ConocoPhillips's royalty calculations were correct.[8]  The court concluded that Hahn ratified the Gips Lease and is therefore bound by all terms within the lease, including its royalty provision.  The court also concluded that ConocoPhillips was entitled to attorney's fees under the UDJA.  The parties entered into a stipulation regarding the amount of attorney's fees, and the trial court signed a judgment in favor of ConocoPhillips.

## H.    Hahn's current appeal (*Conoco 2*)

The court of appeals reversed the trial court a second time, holding that the Lease Ratification did not reduce Hahn's NPRI from a fixed fractional interest in production to a floating fraction of the lease royalty then in effect.  *See* 698 S.W.3d 274, 296-97 (Tex. App.—Corpus Christi–Edinburg 2022) (*Conoco 2*).  Accordingly, the 1/4 landowner's royalty stated in the Gips Lease was inapplicable to Hahn's 1/8 NPRI in Tract A's share of production from Maurer Unit B.  The court also reaffirmed its prior holding in *Conoco 1* that the 2011 Stipulation was incapable of diminishing Hahn's interest as reserved in the Gips Deed,[9] distinguishing our intervening decision in *Concho Resources, Inc. v.*

---

[8] By separate orders, the trial court also sustained ConocoPhillips's objections to an email and spreadsheet Hahn had submitted in response to its motion to strike and ordered that Hahn should take nothing from his claims for money had and received or unjust enrichment against the Gipses.

[9] In their briefing below, the parties continued to dispute the extent to which *Conoco 1* resolved the appeal under the law of the case doctrine.  *See Conoco 2*, 698 S.W.3d at 285.  But in his briefing in this Court, Hahn abandoned his argument that ConocoPhillips's defense of ratification was barred by the law of the case.

*Ellison*, 627 S.W.3d 226 (Tex. 2021). *See Conoco 2*, 698 S.W.3d at 285-87. The court of appeals rendered judgment in part that Hahn's calculation of the applicable royalty decimal was correct and remanded for the trial court to consider Hahn's request for attorney's fees. *Id.* at 295-97. The court also agreed with Hahn that ConocoPhillips's UDJA claim was improper because it duplicated defensive matters already before the court. *Id.* at 296.[10] This appeal followed.

## ANALYSIS

As our starting point, we assume without deciding that the court of appeals correctly held in *Conoco 1* that the Gips Deed reserved a fixed 1/8 NPRI for Hahn.[11] Raising a defense of ratification, ConocoPhillips contends this fixed NPRI was later converted into 1/8 of the 1/4 royalty in the Gips Lease—that is, a floating NPRI—for two separate and independent reasons: (1) Hahn ratified the Gips Lease; and (2) Hahn signed the Stipulation. Hahn defends the court of appeals' holdings that the Lease Ratification did not reduce his NPRI and that our decision in *Concho Resources* does not permit ConocoPhillips to rely on the Stipulation. Hahn also urges us to affirm the court of appeals' judgment because the Stipulation is ineffective on alternative grounds.

We first agree with the court of appeals that the Lease Ratification did not subject Hahn's NPRI to the Gips Lease's royalty provision. As explained below, the ratification does not subject the NPRI

[10] In this Court, ConocoPhillips has not assigned error to this holding or to the resulting reversal of its award of attorney's fees.

[11] Neither party has asked us to disturb this holding or the court of appeals' judgment in *Conoco 1* as part of our review of its decision in *Conoco 2*.

11

to lease provisions that are otherwise inapplicable to non-possessory interests in production. We therefore reject ConocoPhillips's contention that the Lease Ratification supports reinstatement of the trial court's judgment.

Turning to the Stipulation, however, we disagree with the court of appeals' conclusion that our holding in *Concho Resources* "does not bear on" its prior interpretation of the 2011 Stipulation in *Conoco 1* or other documents outside the four corners of a deed. 698 S.W.3d at 287. Finally, we reject Hahn's arguments that the Stipulation is ineffective as a conveyance.

## I. The Lease Ratification did not change Hahn's NPRI from fixed to floating.

The first issue is what happened when Hahn—who owned a 1/8 fixed non-participating royalty interest (NPRI) in production from Tract A—ratified the entirety of the Gips Lease, which pays the Gipses a 1/4 royalty on production in exchange for the lease of their mineral estate in Tract A. The trial court's final judgment in *Conoco 2* declared: (1) "Hahn has ratified the Gips Lease and is therefore bound by all terms in that Gips Lease"; and (2) "based on that ratification, and as it applies solely to Kenneth Hahn's ownership interest in Tract A," ConocoPhillips correctly identified the applicable unit decimal interest for calculating Hahn's share of production from Maurer Unit B.

Reversing, the court of appeals held that Hahn, in ratifying the Gips Lease, "agreed to have his fixed one-eighth NPRI [in production] subject to Tract A's tract participation rate in [the pooled] Maurer Unit B" but not to have that interest diminished by the landowner's royalty

12

fraction under the lease. *Id.* at 290, 292. "As an NPRI owner, [Hahn] has no executive rights and is, therefore, due none of the entitlements owed to the lessor under the lease"—including "a landowner's royalty." *Id.* at 294. Thus, it is "obviously unsound" to apply the terms of those entitlements to Hahn's interest in production. *Id.* We agree.

Texas has adopted the view "that pooling effects a cross-conveyance among the owners of minerals under the various tracts of royalty or minerals in a pool so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized tract." *Montgomery v. Rittersbacher*, 424 S.W.2d 210, 213 (Tex. 1968). "Though governed by contract, pooling involves property rights," *Samson Explor., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 775 (Tex. 2017), and "pooling on the part of the holder of the executive rights cannot be binding upon the non-participating royalty owner in the absence of his consent," *Montgomery*, 424 S.W.2d at 213.[12]

Instead, an NPRI owner like Hahn "has the option to ratify or repudiate a lease containing provisions which as to his interest the holder of the executive rights had no authority to insert in the lease." *Id.* at 215. But if an NPRI owner "ratifies" a separate "pooling agreement" or a lease containing such an agreement, "either by joining in the execution of the agreement or by accepting royalties from the pool, his interest is bound by the pooling agreement." *Id.*; *see also Verble v. Coffman*, 680 S.W.2d 69, 70 (Tex. App.—Austin 1984, no writ)

---

[12] An NPRI owner who refuses to consent to pooling "must be paid on a nonpooled basis while pooled interests share pro rata," such that "a lessee may owe different royalty obligations with respect to the same lands." *Samson Explor., LLC*, 521 S.W.3d at 775.

13

("Ratification of an oil and gas lease by non-participating royalty interest owners . . . has been construed as an offer made by the lessor, and accepted by the royalty owners to apportion all proceeds from the lease.").

"A party ratifies an agreement when—after learning all of the material facts—he confirms or adopts an earlier act that did not then legally bind him and that he could have repudiated." *White v. Harrison*, 390 S.W.3d 666, 672 (Tex. App.—Dallas 2012, no pet.).[13] "Express ratification—in writing, for example—typically makes the parties' intentions clear." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 197 (Tex. 2021). Additionally, "[r]atification may occur when a principal, though he had no knowledge originally of the unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge." *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980).[14]

"[R]atification is a plea in avoidance and thus is an affirmative defense which must be pleaded." *Petroleum Anchor Equip., Inc. v. Tyra*, 419 S.W.2d 829, 834 (Tex. 1967). "When the facts are uncontroverted

---

[13] *See also BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021) ("Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." (internal quotation marks omitted)); *White*, 390 S.W.3d at 672 ("The elements of ratification are: (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act.").

[14] *See also Samson Explor., LLC*, 521 S.W.3d at 785 ("The lessors' awareness followed by acceptance of royalties without challenging the amendment constituted ratification.").

14

. . . the court may decide the question of ratification as a matter of law." *BPX Operating Co.*, 629 S.W.3d at 196.

Each party's briefing devotes significant space to arguing about whether the other party is giving appropriate effect to the Lease Ratification. But the proper rule is straightforward: a ratifier is bound to the "entire transaction" and "may not, in equity, ratify those parts of the transaction which are beneficial and disavow those which are detrimental." *Land Title Co.*, 609 S.W.2d at 757.[15] Thus, an NPRI holder's ratification of an oil and gas lease means any lease provision that *can* apply to an NPRI is binding on the holder. As ConocoPhillips correctly recognizes, applying this rule requires "filtering [Hahn's] royalty interest through a lease agreement that covers a plurality of interests (surface, mineral, and royalty)—some provisions of which can conceivably apply to some of those interests (including Hahn's), and others that cannot."

Our conclusion that the Gips Lease's royalty provision does not apply to Hahn's non-possessory interest in production flows from the

---

[15] "[U]nder longstanding common law, a void act is not susceptible of ratification." *Concho Res.*, 627 S.W.3d at 234 (internal quotation marks omitted); *see also Cummings v. Powell*, 8 Tex. 80, 85 (1852) ("A void act . . . is one which is entirely null, not binding on either party, and not susceptible of ratification . . . ."). Because we hold in Part II below that the 2011 Stipulation was not void, we need not address whether a contrary holding would foreclose ConocoPhillips's defense of ratification. *See Concho Res.*, 627 S.W.3d at 234 n.10 (noting that a void deed may be ratified under certain circumstances by a formal recognition of its validity); *see also Cummings*, 8 Tex. at 85 ("[A] voidable act is one which is obligatory upon others until disaffirmed by the party with whom it originated and which may be subsequently ratified or confirmed.").

different nature of the property interests involved.[16] An NPRI is a fractional non-possessory interest in oil and gas produced from the tract.[17] It is not ownership of the mineral fee itself, which comes with the rights to possess oil and gas in the ground, to extract it, and to lease those property rights to others. *Hysaw*, 483 S.W.3d at 9. Nor is it a fractional title to that mineral fee—a so-called non-executive mineral interest (NEMI).[18]

This understanding of Hahn's interest informs which provisions of the Gips Lease can apply to that interest. Some provisions in a standard mineral lease certainly apply to an NPRI: for example, as discussed above, we have long held that an NPRI can be pooled.[19] And

---

[16] *Cf. Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991) (recognizing that "[a]n undivided royalty interest may be conveyed as a fixed fraction of total production or as a fraction of the total royalty interest, and if conveyed as a fraction of the total royalty interest its amount (as a percentage of production) depends upon the royalty reserved in future leases").

[17] *See KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 75 (Tex. 2015) (defining an NPRI as "an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty"); *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789 (Tex. 1995) ("A non-participating royalty interest, however, is *non-possessory* in that it does not entitle its owner to produce the minerals himself. It merely entitles its owner to a share of the production proceeds, free of the expenses of exploration and production.").

[18] *Cf. Lesley v. Veterans Land Bd.*, 352 S.W.3d 479, 487 (Tex. 2011) ("The non-executive mineral interest owner owns the minerals in place but does not have the right to lease them."); *Altman v. Blake*, 712 S.W.2d 117, 118-19 (Tex. 1986) ("This court has before recognized that a mineral interest shorn of the executive right and the right to receive delay rentals remains an interest in the mineral fee.").

[19] *See, e.g.*, *Samson Explor., LLC*, 521 S.W.3d at 774 ("A lessee's authority to pool requires the lessor's consent, which is typically furnished via a pooling provision in the mineral lease."); *Montgomery*, 424 S.W.2d at 213

16

the parties seem to agree that other provisions do not apply to an NPRI: for example, that Hahn would not be entitled to share in delay rentals or shut-in royalties, which involve no production.[20]

Does a standard lease provision obligating the lessee to pay royalties to the mineral fee owner also apply to a pre-existing fixed NPRI, making it a floating NPRI? Under our cases, the answer is no. As we explained in *Hysaw v. Dawkins*,

> [r]oyalty interests may be conveyed or reserved as a fixed fraction of total production (fractional royalty interest) or as a fraction of the total royalty interest (fraction of royalty interest). A fractional royalty interest conveys a fixed share of production and *remains constant regardless of the amount of royalty contained in a subsequently negotiated oil and gas lease.* In comparison, a fraction of royalty interest (as a percentage of production) varies [or "floats"] in accordance with the size of the landowner's royalty in a mineral lease and is calculated by multiplying the fraction in the royalty reservation by the royalty provided in the lease.

483 S.W.3d at 9 (internal quotation marks and citations omitted, emphasis added). Because Hahn's interest is a fixed share of production,

---

(holding pooling allowed with consent of NPRI holder); *Brown v. Smith*, 174 S.W.2d 43, 47 (Tex. 1943) (referring to the benefits of "a pooling agreement which binds all of the royalty owners"); *MCZ, Inc. v. Triolo*, 708 S.W.2d 49, 52 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (explaining that consent to pool may be provided by agreement or by participation in a lease that contains a pooling provision).

[20] Indeed, the lease's pooling provision explicitly states that "[t]he formation of any unit hereunder shall not have the effect of changing the ownership of any delay rental or shut-in production royalty which may become payable under this lease."

it remains constant regardless of the amount of royalty stated in the subsequently negotiated Gips Lease.[21]

Our conclusion comports with the general rule that an NPRI holder's interest in oil and gas produced from the tract is not leasable. *See Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003) ("A royalty interest, as distinguished from a mineral interest, is a non-possessory interest."); *Hawkins v. Tex. Oil & Gas Corp.*, 724 S.W.2d 878, 888 (Tex. App.—Waco 1987, writ ref'd n.r.e.) (explaining that lease executed by royalty owner is void because "the doctrine of estoppel cannot create rights where none exist"); *see also* 1 H. Williams & C. Meyers, OIL & GAS LAW § 303.3 (2023 ed.) ("A royalty owner has no power to lease, and a purported lease from him is void." (footnotes omitted)). Indeed, the Gips Deed itself expressly prohibits Hahn from "participat[ing] in the making of any oil, gas or mineral lease covering said property." Instead, ConocoPhillips agreed to pay the mineral fee owners a 1/4 royalty in exchange for fee simple determinable ownership of the minerals themselves. That ownership includes the rights to possess the oil and gas in place under the tract and to extract it—rights that were held entirely by the Gipses. *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 49 (Tex. 2017); *Coastal Oil & Gas*

---

[21] *See also KCM Fin. LLC*, 475 S.W.3d at 81 ("[T]he value of a non-participating royalty interest is not left exclusively to the whims of the executive.").

18

*Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 15 (Tex. 2008). Thus, the lessor royalty provision in the Gips Lease does not apply to Hahn's NPRI.[22]

Of course, as the court of appeals noted, a non-possessory royalty interest in production can easily be affirmatively modified or transferred in whole or in part in other ways, including by assignment. *See* 698 S.W.3d at 292 (citing *Montgomery*, 424 S.W.2d at 214). But the Gips Lease that Hahn ratified does not purport to do so. To the contrary, certain language in the Gips Lease supports the conclusion that the lease royalty does not apply to an NPRI.

For example, the pooling clause provides that when "computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas . . . from the pooled unit," ConocoPhillips's pro rata allocation "shall be on an acreage basis." The lease's pooling clause thus distinguishes between (1) royalties and (2) payments out of production, which suggests that the lease's provision fixing the amount of the mineral interest owner's royalty does not apply to the payments out of production owed to an NPRI. We cannot agree with ConocoPhillips that an NPRI holder's ratification of the entire lease negates the operative effect of language within the pooling clause distinguishing between the two types of payments. For these reasons, the royalty provision of the Gips Lease does not reduce Hahn's NPRI.

---

[22] In light of this conclusion on the merits, we need not reach Hahn's argument that ConocoPhillips's reliance on the Lease Ratification is procedurally barred under the doctrines of waiver, estoppel, or laches.

## II. The Stipulation changed Hahn's NPRI from fixed to floating.

ConocoPhillips's second challenge to the court of appeals' judgment in *Conoco 2* concerns the Stipulation that the NPRI reserved to Hahn in the Gips Deed "was a one-eighth (1/8) 'of royalty.'" All parties agree that if this Stipulation was effective, Hahn's NPRI in Tract A is floating rather than fixed—that is, the 1/4 royalty fraction in the Gips Lease reduces the 1/8 NPRI fraction.

Their dispute concerns whether the Stipulation was effective. The court of appeals held in *Conoco 1* that because the Gips Deed unambiguously reserved a fixed NPRI for Hahn, the Stipulation was immaterial to the deed's meaning and the trial court violated the four corners rule by considering it. 2018 WL 771908, at *8 n.4. Then, in *Conoco 2*, the court of appeals concluded our intervening decision in *Concho Resources* did not warrant reconsidering this holding because that case (1) concerned a boundary that (2) was uncertain or ambiguous in the minds of the parties. 698 S.W.3d at 287. The parties disagree about whether *Concho Resources* is distinguishable for these reasons, as well as whether the Stipulation is ineffective on alternative grounds urged by Hahn. We address these issues in turn.

### A. A written agreement to settle matters of property ownership can be enforced without proof of uncertainty.

In *Concho Resources*, we considered a written boundary stipulation that recited "[o]n its face" the parties' desire to answer a "question that has arisen among the owners of the adjacent mineral estates" regarding the physical location of the two tracts and the

20

boundary line between them. 627 S.W.3d at 234 (cleaned up). The stipulation described the boundary line to which the parties agreed in return for adequate consideration and provided for conveyances as necessary to transfer ownership accordingly. Rejecting the lower court's holding that such agreements are void unless there is some ambiguity or error in the underlying instrument(s) of conveyance, we held that the boundary stipulation "is enforceable between the parties according to its terms." *Id.* Although "the boundary stipulation could not by itself bind others who had an interest in the tracts and were not parties to the agreement," it constituted "a valid agreement between the mineral owners of the two tracts at issue." *Id.* at 236.

Similarly here, the written stipulation recites Hahn's and the Gipses' "wish to stipulate" as to their interests "for purposes of clarifying their ownership." It then provides that for adequate consideration, the parties agree Hahn's reserved interest was a 1/8 "of royalty," and it includes cross-conveyance language to effectuate the stipulation.

Yet the court of appeals concluded this stipulation was not enforceable under *Concho Resources* for two reasons. First, the court reasoned there was "no evidence in the 2011 stipulation of interest or elsewhere" of "ambiguity in the minds of the parties" as to Hahn's correct royalty. 698 S.W.3d at 287. To the contrary, we observe that the Stipulation recites its purpose of "clarifying" the parties' interests.

But more importantly, we disagree with the court of appeals that proof of subjective uncertainty regarding the correct property interests

21

is required before such a written stipulation can be given effect.[23]  In *Concho Resources*, we declined to bind parties equitably to recitals in the underlying deeds, rejecting that estoppel theory as "a modified version of the argument that objective ambiguity is required to justify a boundary agreement."  627 S.W.3d at 238.  Adjacent owners' "free[dom] to resolve uncertainty *amongst themselves*," *id.*, we said, is meaningless if a factfinder can "second-guess the owners' decision to bind themselves in that manner," *id.* at 235.  "Settlement agreements are highly favored in the law because they are a means of amicably resolving doubts and preventing lawsuits."  *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 n.33 (Tex. 2008).  Requiring proof of ambiguity—whether objective or subjective—"would scuttle" agreements between property owners as to their respective interests "as a mechanism to avoid litigation because parties will never know whether their informal settlement of a boundary dispute is effective until it is declared so by a court."  *Concho Res.*, 627 S.W.3d at 235 (internal quotation marks omitted).  We declined to impose such a requirement in *Concho Resources* and decline again today.

Second, the court of appeals read *Concho Resources* as limited to agreements establishing the physical location of a property boundary.  698 S.W.3d at 287 (declining to apply *Concho Resources* "outside the boundary dispute context").  Hahn urges that boundary agreements are governed by a special set of relaxed rules because they do not convey

---

[23] As we described in *Concho Resources*, a different rule applies to oral or implied agreements.  627 S.W.3d at 226 n.12.

22

interests in real property[24] and remedy the historical unreliability of land surveys.

But *Concho Resources* did not attribute any favored status to concerns particular to land boundaries. Instead, we emphasized deference to the owners' "ch[oice] to resolve . . . the boundary location informally by executing [a] stipulation" despite their ability to obtain a court's determination of the boundary. 627 S.W.3d at 235. We chose to recognize "agreements as a mechanism to avoid litigation" rather than making agreements the subject of potential litigation. *Id.* And we have specifically encouraged the use of stipulations about the nature or amount of an NPRI to avoid the need for judicial clarification.[25]

Accordingly, neither of the court of appeals' two distinctions of *Concho Resources* provides a reason for concluding that the Stipulation is unenforceable. We therefore turn to Hahn's other arguments against enforcing the Stipulation. The court of appeals did not reach these alternative grounds, but we exercise our discretion to do so in the interest of judicial economy.[26]

---

[24] In fact, the boundary stipulation in *Concho Resources* did include conveyance language.

[25] *See, e.g.*, *Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 368 n.10 (Tex. 2023) ("[I]t is a misfortune that the contract or replacement deed was not filed, because that simple step would have removed the need for the present litigation.").

[26] *See* TEX. R. APP. P. 53.4; *Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 855 (Tex. 2011).

**B.    The Stipulation contains adequate descriptions from which the relevant property interests may be identified with reasonable certainty.**

Hahn raises two other arguments against enforcing the Stipulation that are not resolved by our discussion of *Concho Resources*. First, he contends the Stipulation is not enforceable as a conveyance because "[i]ts incoherent description of the interest to be conveyed renders its 'operative' language equally unintelligible." Second, Hahn argues that the Stipulation is not enforceable as a contract for various reasons, including that his affidavit testimony rebutted the presumption of consideration arising from the instrument's recitals. Because we conclude the Stipulation does not fail as a conveyance for the reason Hahn advocates, we need not address whether it is also enforceable as a contract.

A valid conveyance of an interest in land "must satisfy the requirements of both the statute of conveyances, Property Code section 5.021, and the statute of frauds, Business and Commerce Code section 26.001." *Gordon v. W. Houston Trees, Ltd.*, 352 S.W.3d 32, 43 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Otherwise, "it is not necessary to have all the formal parts of a deed formerly recognized at common law or to [include] technical words." *Harlan v. Vetter*, 732 S.W.2d 390, 392 (Tex. App.—Eastland 1987, writ ref'd n.r.e.).[27]

---

[27] *See also* TEX. PROP. CODE § 5.022(c) ("The parties to a conveyance may insert any clause or use any form not in contravention of law."); *Luckel*, 819 S.W.2d at 463 ("In particular, the labels we have given the clauses of 'granting,' 'warranty,' 'habendum' and 'future lease' are not controlling," and we will instead "give effect to the substance of unambiguous provisions.").

Thus, we have "eschew[ed] reliance on mechanical or bright-line rules as a substitute for an intent-focused inquiry rooted in the instrument's words," *Hysaw*, 483 S.W.3d at 13, and "rejected mechanical rules of construction, such as giving priority to certain clauses over others, or requiring the use of so-called 'magic words,'" *Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017).[28] Although we endeavor to "giv[e] the deed's words their plain meaning, reading it in its entirety, and harmonizing all of its parts," *id.* at 797, "[w]hen part of a deed's property description is incorrect, we will disregard that part as surplusage and enforce the deed if the remainder of the description identifies the land with sufficient certainty," *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 745 n.12 (Tex. 2020).[29] "[It] is not the actual intent of the parties that governs, but the actual intent of the parties *as expressed in the instrument as a whole*, without reference to matters of mere form, relative position of descriptions, technicalities, or arbitrary rules." *Luckel*, 819 S.W.2d at 462 (internal quotation marks omitted).

---

[28] *See also Reynolds v. McMan Oil & Gas Co.*, 11 S.W.2d 778, 781 (Tex. Comm'n App. 1928, holding approved, judgm't adopted) ("The relative positions of the different parts of the instrument are not necessarily controlling; the modern and sounder reason being to ignore the technical distinctions between the various parts of the deed, and to seek the grantor's intention from them all without undue preference to any . . . .").

[29] *Accord In re Off. of Att'y Gen. of Tex.*, 456 S.W.3d 153, 156 (Tex. 2015) ("[C]ourts should resist rulings anchored in hyper-technical readings of isolated words or phrases. The import of language, plain or not, must be drawn from the surrounding context . . . ."); *Hahn v. Love*, 394 S.W.3d 14, 25 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ("We are also mindful that a deed should not be declared void for uncertainty if it is possible, by any reasonable rules of construction, to ascertain from the description, aided by extrinsic evidence, what property the parties intended to convey.").

Under these principles, the following elements are generally required for a deed to accomplish a legally effective conveyance:[30] (1) the instrument of conveyance is in writing;[31] (2) the interest to be conveyed is sufficiently described;[32] (3) the grantor and grantee can be ascertained from the instrument as a whole;[33] (4) there are operative words or words of grant showing an intention by the grantor to convey title to a real

---

[30] Depending on the circumstances at issue, other factors concerning the execution of a deed may affect the deed's validity, such as fraud, duress, mistake, forgery, mental incapacity, or lack of notice. *See* TEX. PROP. CODE § 13.001(a) (a conveyance is void as to creditors and bona fide purchasers as "without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law"); TEX. JUR. 3d Deeds § 183.

[31] *See* TEX. PROP. CODE § 5.021; TEX. BUS. & COM. CODE § 26.01(a), (b)(4).

[32] *See Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983) ("It is well settled that in order for a conveyance or contract of sale to meet the requirements of the Statute of Frauds, it must, insofar as the property description is concerned, furnish within itself or by reference to other identified writings then in existence, the means or data by which the particular land to be conveyed may be identified with specific certainty."); *Republic Nat'l Bank of Dallas v. Stetson*, 390 S.W.2d 257, 261 (Tex. 1965) ("There being no land described in the deed, it could not operate as a conveyance."); *but see Long Trs. v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) ("Extrinsic evidence may be used only for the purpose of identifying the [property] with reasonable certainty from the data contained in the contract, not for the purpose of supplying the location or description of the [property]." (internal quotation marks omitted)).

[33] *See, e.g.*, *Haile v. Holtzclaw*, 414 S.W.2d 916, 927 (Tex. 1967) ("Since W. B. Haile was dead when the deed was executed, his 'estate' or heirs were capable of being ascertained; therefore, under the above authorities we hold the grantee was sufficiently described."); *Vineyard v. O'Connor*, 36 S.W. 424, 425 (Tex. 1896) (holding "grantee need not be named" so long as he is "described" and "may be definitely ascertained" from that description).

property interest to the grantee;[34] (5) the instrument is properly signed and acknowledged by the grantor;[35] and (6) the instrument is delivered to and, if necessary, accepted by[36] the grantee.[37] "A covenant of warranty is not required in a conveyance," TEX. PROP. CODE § 5.022(b),[38]

---

[34] *See, e.g.*, *Luckel*, 819 S.W.2d at 462 (holding language at issue was "as effective to grant an interest as the formal 'do hereby grant, bargain, sell and convey' language of what we have designated as the 'granting' clause"); *Baker v. Westcott*, 11 S.W. 157, 158 (Tex. 1889) ("[T]he form of the instrument is a matter of no moment if it manifests the intention of the grantor to convey to the grantee the entire title by the very terms of the instrument itself."); *Vineyard*, 36 S.W. at 425 (looking to whether "the instrument itself makes it manifest that it was the purpose of the grantor to convey the property to another, who in the deed itself is designated with reasonable certainty").

[35] *See, e.g.*, *Haile*, 414 S.W.2d at 927 (holding "execution and delivery of the deed was a gift of the property described therein").

[36] *See* TEX. PROP. CODE § 5.021 (providing instrument of conveyance "must be subscribed and delivered by the conveyor or by the conveyor's agent authorized in writing"); *Steffian v. Milmo Nat'l Bank*, 6 S.W. 823, 824 (Tex. 1888) ("[T]he delivery of a deed is requisite to its validity as a conveyance. To take effect, it is quite as necessary that it should be delivered as that it should be signed."); *McLaughlin v. McManigle*, 63 Tex. 553, 556 (1885) ("It may be an actual or constructive delivery; and if it be not actually delivered to the grantee or his authorized agent, it is essential to its validity to prove notice to the grantee of its execution and such additional circumstances as will afford a reasonable presumption of its acceptance.").

[37] *Accord Gordon*, 352 S.W.3d at 43 ("[I]f (1) from the instrument as a whole a grantor and grantee can be ascertained and (2) there are operative words or words of grant showing an intention by the grantor to convey to the grantee title to a real property interest, (3) which is sufficiently described, and (4) the instrument is signed and acknowledged by the grantor, then the instrument of conveyance is a deed that accomplishes a legally effective conveyance."); *Masgas v. Anderson*, 310 S.W.3d 567, 570 (Tex. App.—Eastland 2010, pet. denied); *Green v. Canon*, 33 S.W.3d 855, 858 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); TEX. JUR. 3d Deeds § 13.

[38] Instead, "[a]s a matter of longstanding common law, in the absence of any qualifying expressions, the covenant of seisin is read into every conveyance

27

and "[w]e have long recognized the validity of quitclaim deeds, even if it turns out that they convey nothing," *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 486 (Tex. 2005).

Here, Hahn primarily attacks the Stipulation's compliance with the second and third elements. As in some of our past cases, the Stipulation "is not a model of clarity," but when "read in its entirety, we see only one reasonable interpretation of its words." *Wenske*, 521 S.W.3d at 798.[39] Under that construction, "all parts of the description are reconciled and the [property interest] is identified with reasonable certainty," *Gates v. Asher*, 280 S.W.2d 247, 249 (Tex. 1955), as are the respective grantor and grantee. Accordingly, we adopt the unifying construction we articulate below, which we conclude is sufficient to support a valid conveyance.

"While the Statute of Frauds provides that all contracts for the sale of real estate must be in writing, . . . [i]t has been left to the courts to determine the substance and form the written instrument must satisfy before it is enforceable." *Kmiec v. Reagan*, 556 S.W.2d 567, 569 (Tex. 1977). As we have previously recognized, Texas courts "employ[]

---

of land or an interest in land, except in quitclaim deeds." *Chi. Title Ins. Co. v. Cochran Invests., Inc.*, 602 S.W.3d 895, 901 (Tex. 2020) (internal quotation marks omitted).

[39] *See also Dahlberg v. Holden*, 238 S.W.2d 699, 701 (Tex. 1951) ("[I]t is a rule universally recognized that if an instrument admits of two constructions, one of which would make it valid and the other invalid, the former must prevail."); *Hahn v. Love*, 394 S.W.3d 14, 25 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ("We are also mindful that a deed should not be declared void for uncertainty if it is possible, by any reasonable rules of construction, to ascertain from the description, aided by extrinsic evidence, what property the parties intended to convey.").

a rather strict application of the statutes of frauds and conveyances," but "the words of description are given a liberal construction in order that the conveyance may be upheld." *Gates*, 280 S.W.2d at 248.

The instrument itself must contain "the essential terms of a contract, expressed with such certainty and clarity that it may be understood without recourse to parol evidence to show the intention of the parties." *Wilson v. Fisher*, 188 S.W.2d 150, 152 (Tex. 1945). "No part of the instrument is more essential than that which identifies the subject matter of the agreement." *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983). Accordingly, external evidence cannot be used "for the purpose of supplying the location or description of the land." *Wilson*, 188 S.W.2d at 152. But if the contract "refers to another instrument which contains a proper description of the property, such [] instrument may be looked to in aid of the description." *Maupin v. Chaney*, 163 S.W.2d 380, 383 (Tex. 1942).[40] Thus, it is sufficient if the instrument "furnish[es] within itself *or by reference to other identified writings then in existence*, the means or data by which the particular land [or interest in land] to be conveyed may be identified with specific certainty." *Pick*, 659 S.W.2d at 637 (emphasis added). If the instrument inadequately describes the land and contains no such reference to external evidence,

---

[40] *Accord Long Trs.*, 222 S.W.3d at 416 ("Extrinsic evidence may be used only for the purpose of identifying the [property] with reasonable certainty from the data contained in the contract, not for the purpose of supplying the location or description of the [property]." (internal quotation marks omitted)); *Pickett v. Bishop*, 223 S.W.2d 222, 223-24 (Tex. 1949).

however, parol evidence cannot be used to satisfy the statute of frauds. *Id.* at 638.[41]

Turning to the instrument before us, the first paragraph of the Stipulation states that "the undersigned are the respective present owners of a mineral interest in, under and to the land more particularly described in Exhibit 'A' attached hereto and incorporated herein for all purposes, which land shall be hereinafter referred to as 'Subject Lands.'" The attached Exhibit A references the recorded Gips Deed and includes that deed's description of Tract A under the title "Subject Lands." Thus, the Stipulation identifies Hahn and the Gipses as the present owners of a mineral interest in Tract A and furnishes, "by reference to other identified writings then in existence, the means or data by which" to identify Tract A "with specific certainty." *Id.* at 637.

The second and third paragraphs state that the parties "wish to stipulate for the record the respective royalty interests owned by Kenneth Hahn in and to the Subject Lands," further noting that non-signatory ConocoPhillips is the "present owner" of the "Subject Lease"[42] and "has requested the undersigned to stipulate as to their ownership in Subject Lands for purpose of clarifying their ownership." Those statements explain the parties' relationship to one another through

---

[41] *See also Matney v. Odom*, 210 S.W.2d 980, 984 (Tex. 1948) ("Since the description, or the key thereto, must be found in the language of the contract, the whole purpose of the statute of frauds would be frustrated if parol proof were admissible to supply a description of land which the parties have omitted from their writing." (internal quotation marks omitted)).

[42] Like the Stipulation's incorporation of the Gips Deed, the Subject Lease is further defined in Exhibit B to mean the Gips Lease.

their respective ownership interests in Tract A, as well as the agreement's purpose as to ConocoPhillips.

Next, the fourth paragraph of the Stipulation states that Hahn and the Gipses "do[] hereby acknowledge, stipulate and agree that it was the intent of the parties in the deed from Kenneth Hahn to William Paul Gips and Lucille Fay Gips, recorded in Volume 121, Page 625, Official Public Records, DeWitt County, Texas [(*i.e.*, the Gips Deed)] *that the interest reserved* was a one-eighth (1/8) 'of royalty' for a term of 15 years from June 9, 2002," and it recites that the agreement is made "for and in consideration of the premises and other valuable considerations, the receipt and sufficiency of which are hereby acknowledged." (emphasis added). Because the Gips Deed contains only one reservation, the Stipulation sufficiently identifies its subject as "the interest reserved" in the Gips Deed.[43] As a whole, then, the Stipulation's fourth paragraph is an agreement between Hahn and the Gipses as to their subjective intent at the time of executing the Gips Deed, which was to create and reserve for Hahn a floating 1/8 NPRI in Tract A.

The Stipulation's operative language of conveyance then appears in the fifth paragraph:

> To effectuate the purposes of this Stipulation of Interest, each of the parties hereto does hereby *grant, bargain, sell, convey, quitclaim and deliver* unto each of the other respective parties *any interest* in *the Subject Interest (as herein stipulated)* necessary to vest in each of said respective parties the interest set opposite their name above, together with all rights incident thereto, to have and

---

[43] *Cf. Pick*, 659 S.W.2d at 637 (holding property descriptions such as "'my property,' 'my land,' or 'owned by me'" are sufficient when the party to be charged owns a tract and only one tract of land which satisfies the description).

> to hold the same to each of said parties and their respective successors, heirs and assigns forever.

(emphases added). Although Hahn concedes the Stipulation contains language of cross-conveyance, Hahn complains this language is not a coherent description of the interests to be conveyed because the Stipulation does not elsewhere define "Subject Interest" or "set out" any interest opposite the name of any party. We disagree.

We read the phrase "Subject Interest (as herein stipulated)" as an unambiguous reference to the parties' "stipulat[ion] and agree[ment]" in the preceding paragraph regarding the intended scope of "the interest reserved in" the Gips Deed. *See Dahlberg v. Holden*, 238 S.W.2d 699, 701 (Tex. 1951) ("If . . . the language of the deed is reasonably susceptible of a construction which would identify any definite interest in the land in suit, we should give it that construction . . . ."). The Stipulation does not expressly link "Subject Interest" to the preceding paragraph, but the capitalization is consistent with the usage of "Subject Lands" and "Subject Lease," both of which are likewise named immediately following a more detailed description.[44]

Although Hahn is correct that the Stipulation does not explicitly enumerate any interest opposite the name of any party, the fourth paragraph does refer to (1) a reservation in (2) a deed from Hahn to the

---

[44] *Cf. Reynolds*, 11 S.W.2d at 781 ("In determining the legal effect of a deed, whether as to grant, exception, reservation, consideration, or other feature, the inquiry is not to be determined alone from a single word, clause, or part but from every word, clause, and part that is pertinent.").

Gipses.[45] "[A] reservation is a form of 'exception' through which the grantor excludes for itself a portion of that which would otherwise fall within the deed's description of the interest granted." *Piranha Partners*, 596 S.W.3d at 748. By definition, a reservation will always create for the grantor an interest that did not previously exist, the existence of which reduces or encumbers the interest in property otherwise described as being conveyed to the grantee. In other words, "a reservation carves out of the grant *a new thing or estate*." *Reynolds v. McMan Oil & Gas Co.*, 11 S.W.2d 778, 781 (Tex. Comm'n App. 1928, holding approved, judgm't adopted) (emphasis added).[46] Hahn is the only possible grantor under the 2011 Stipulation because he was the grantor in the Gips Deed.[47]

We likewise disagree with Hahn's view that missing information is needed to ascertain the interests being conveyed and the interests

---

[45] *Cf. Maupin*, 163 S.W.2d at 431 ("[E]ven though the reference to the other instrument is itself in some respects erroneous, or the instrument is otherwise misdescribed in some particular, yet such other instrument may nevertheless be looked to in ascertaining what property was intended to be conveyed if it corresponds with the reference in other respects . . . .").

[46] *See also Arden v. Boone*, 187 S.W. 995, 997 (Tex. Civ. App.—Fort Worth 1916) ("A reservation is the creation in behalf of the grantor of a new right issuing out of a thing granted, something which did not exist as an independent right before the grant; while an exception operates to withdraw some part of the thing granted which would otherwise have passed to the grantee under the general description." (quoting 8 R.C.L. p. 1090, § 147)), *aff'd*, 221 S.W. 265 (Tex. Comm'n App. 1920, judgm't approved).

[47] *Vineyard*, 36 S.W. at 425 (holding "grantee need not be named" so long as he is "described" and "may be definitely ascertained" from the description); *see also Wilson v. Fisher*, 188 S.W.2d 150, 154 (Tex. 1945) ("When the description of the property to be conveyed is of doubtful sufficiency, ownership is an important element." (internal quotation marks omitted)).

each party will hold following the Stipulation. By stipulating that the "interest reserved [to Hahn] was a one-eighth (1/8) 'of royalty,'" the fourth paragraph adequately sets forth "[a] general description [that] may be looked to in aid of a particular description [in the fifth paragraph] that is defective or doubtful." *Sun Oil Co. v. Burns*, 84 S.W.2d 442, 446 (Tex. [Comm'n Op.] 1935).

Finally, contrary to Hahn's contention, our cases do not require that the property description clearly specify whether the royalty is fixed or floating or identify the quantum of royalty being conveyed that would result in Hahn holding the stipulated interest.[48] Accordingly, we read the phrase "necessary to vest in each of said respective parties the interest set opposite their name above" to mean a conveyance of whatever interest is necessary to result in Hahn's ownership of an NPRI that adheres to the intended scope of the reservation stated in the preceding fourth paragraph—that is, of a floating 1/8 NPRI.[49]

---

[48] *See, e.g.*, *Hysaw*, 483 S.W.3d at 4 (recognizing that "[m]ineral deeds employing double fractions give rise to disputes about whether the instrument creates a fixed ('fractional') royalty or a floating ('fraction of') royalty"); *Luckel*, 819 S.W.2d at 463 (holding that because assumption that the parties contemplated the usual one-eighth royalty was "equally consistent" with language fixing the royalty interest as it was with language suggesting a floating royalty interest, the court of appeals erred in favoring one construction over the other); *Middleton v. Broussard*, 504 S.W.2d 839, 842 (Tex. 1974) (holding deed language referring to fractional interests in "land described in the deed" will result in different royalty calculation than language referring to fractional interests in "land conveyed by the deed"); *Schlitter v. Smith*, 101 S.W.2d 543, 544 (Tex. 1937) (construing reservation of "royalty rights" to mean "an interest in oil, gas, or minerals paid, received, or realized as 'royalty' under" existing and future leases).

[49] Indeed, the reference to "any interest in the [reservation] necessary to vest in each of said respective parties" the interests set forth in the preceding

34

The 2011 Stipulation's effectiveness as a conveyance finds further support in its inclusion of "quitclaim" language in the operative granting clause. Whereas "[a] warranty deed to land conveys property[,] a quitclaim deed conveys the grantor's rights in that property, if any." *Geodyne Energy*, 161 S.W.3d at 486.[50] Thus, "[a] quitclaim deed, on its own, does not establish any title in the grantee; it merely conveys any interest the grantor *may* have." *Cowan v. Worrell*, 638 S.W.3d 244, 261 (Tex. App.—Eastland 2022, no pet.). "[F]or the quitclaim to be a conveyance, title in the grantor must be shown." *McMahon v. Fender*, 350 S.W.2d 239, 240 (Tex. Civ. App.—Waco 1961, writ ref'd n.r.e.).

"In deciding whether an instrument is a quitclaim deed, courts look to whether the language of the instrument, taken as a whole, conveyed property itself or merely the grantor's rights." *Geodyne Energy*, 161 S.W.3d at 486. "But if a deed, taken as a whole, discloses a purpose to convey the property itself, as distinguished from the mere right, title, or interest of the grantor, then the instrument is not a quitclaim deed." *Chicago Title*, 602 S.W.3d at 901 (internal quotation marks omitted).

---

paragraph is similar to the common practice of conveying any interest in land "now owned" by the Grantor. *See, e.g.*, *Perryman v. Spartan Tex. Six Cap. Partners, Ltd.*, 546 S.W.3d 110, 117 (Tex. 2018) (holding phrase "'now owned by Grantor' modifie[d] the term premises" and "served to further identify the premises that the deeds purported to convey").

[50] *See also Black v. Washington Mut. Bank*, 318 S.W.3d 414, 418 (Tex. App.—Houston [1st Dist.] 2010, pet. dism'd w.o.j.) ("[A] quitclaim deed, by its very nature, only transfers the grantor's right in that property, if any, without warranting or professing that the title is valid.").

Here, neither side has argued that any interim act—aside from the disputed effect of the Lease Ratification discussed above—would have diminished the nature or quantum of Hahn's ownership interest in Tract A between his execution of the Gips Deed and the 2011 Stipulation. It is therefore immaterial whether the Stipulation conveyed the property itself or merely Hahn's rights in the property. *Cf. McMahon*, 350 S.W.2d at 240 (holding quitclaim deed effective as conveyance if grantor held title when deed was executed).

But viewing the Stipulation through the lens of a quitclaim deed helps illustrate the flawed nature of Hahn's contention that an instrument cannot effect a valid conveyance without identifying the specific quantum of royalty being conveyed.[51] To the contrary, "[q]uitclaim deeds are commonly used to convey interests of an unknown extent or claims having a dubious basis." *Geodyne Energy*, 161 S.W.3d at 487.[52] We are mindful that the Stipulation's granting clause employs language of cross-conveyance to accomplish a conveyance that—in light of our holdings today and those of the court of appeals in *Conoco 1*—

---

[51] *Cf. Burns v. Goodrich*, 392 S.W.2d 689, 692 (Tex. 1965) (holding deed's reference to an interest in certain premises "which [grantor] inherited from his [parents]" was "not an intention clause restricting the granting clause to a conveyance of the grantor's interest, whatever it might be," but rather "an identifying reference to the interest in land which was the subject of the conveyance").

[52] *See also Jackson v. Wildflower Prod. Co., Inc.*, 505 S.W.3d 80, 89 (Tex. App.—Amarillo 2016, pet. denied) ("Typically, a quitclaim deed is used *when the interest of the grantor is unknown or uncertain* and the grantor wants to limit or extinguish potential liability arising from any claim the grantee might assert against the grantor pertaining to the grantor's ownership interest." (emphasis added)).

could be viewed as a unilateral transfer to the Gipses of part of the NPRI originally retained by Hahn. But "[w]e have long recognized the validity of quitclaim deeds, *even if it turns out that they convey nothing.*" *Id.* at 486 (emphasis added).

The inclusion of quitclaim language here is consistent with and further supports our conclusion that, read as a whole, the Stipulation contains an adequate description of any interest in property being conveyed. Accordingly, we hold that the Stipulation is not rendered unenforceable as a conveyance for the reasons urged by Hahn.

## CONCLUSION

We hold that the court of appeals erred in reversing the trial court's judgment and rendering judgment in Hahn's favor because the Stipulation supports ConocoPhillips's entitlement to summary judgment on its affirmative defense of ratification, and Hahn failed to raise any fact issues on elements of that defense. We therefore reverse the portion of the court of appeals' judgment with respect to the Tract A royalty calculation, as requested by ConocoPhillips. We render judgment that as a result of the Stipulation, Hahn maintained a floating 1/8 NPRI in Tract A, and his royalty decimal interest in and to the proceeds of production from the Maurer Unit B pooled unit was .00376838 from first production until June 9, 2017.[53]

---

[53] ConocoPhillips requested this partial reversal in its prayer for relief but did not further specify the appropriate disposition. Having concluded that ConocoPhillips is entitled to the reversal it prayed for, we look to the appellate rules for the appropriate disposition, which in this case is to render the judgment the lower court should have rendered. *See* TEX. R. APP. P. 60.2(c);

37

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** December 31, 2024

---

*Garza v. Cantu*, 431 S.W.3d 96, 108-09 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).